**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **H.C. JEFFRIES TOWER** | § | **CASE NO. 17-35027-H5-11** |
| **COMPANY, INC.** | § | **(Chapter 11)** |
| Debtor | § | |
| | § | |
| **FORD STEEL, LLC.** | § | **CASE NO. 17-35028** |
| Debtor | § | **(Chapter 11)** |
| | § | **JUDGE RODRIGUEZ** |
| | § | |
| | § | **JOINTLY ADMINISTERED UNDER** |
| | § | **CASE NO. 17-35027-H5-11** |

_____

# Debtor H.C. Jeffries Tower Company, Inc.'s
# First Amended Disclosure Statement

_____

Comes now H.C. JEFFRIES TOWER COMPANY, INC., Debtor-in-Possession herein, and files this First Amended Disclosure Statement pursuant to the provisions of Section 1125 of Title 11 of the United States Code.

## Table of Contents

| | Topic | Page |
|---|---|---|
| I. | Introduction | 3 |
| II. | Nature of Chapter 11 Reorganization Proceedings | 5 |
| III. | Consideration in Voting on Chapter 11 Plan | 7 |
| IV. | History of the Debtor | 9 |
| | A. Background | 9 |
| | B. Events Leading to Chapter 11 Filing | 13 |
| | C. Operation and Present Condition of the Debtor While in Chapter 11 | 13 |

V.     Anticipated Future of the Debtor ................................................................. 16

       A.    Liquidation Analysis ................................................................. 16

       B.    Absolute Priority Rule ................................................................. 17

VI.    Source of information for this Disclosure Statement .................................... 17

VII.   Disclaimer ................................................................................................. 18

VIII.  Professional Fees ...................................................................................... 19

IX.    Description of Assets ................................................................................. 19

X.     Summary of Plan ....................................................................................... 19

       A.    Classes under the Plan ................................................................. 21

       B.    Other Provisions ......................................................................... 26

       C.    Bar Dates for Filing Proof of Claims .......................................... 27

XI.    Pending Litigation ..................................................................................... 28

XII.   Alternatives to the Plan Proposed ............................................................. 29

       A.    Conversion ................................................................................. 29

       B.    Dismissal ................................................................................... 30

       C.    Default ....................................................................................... 30

XIII.  Federal Income Tax Consequences to Creditors & Debtor ......................... 31

XIV.   Means for Implementation and Execution of the Plan ................................ 32

XV.    Modification of Disclosure ........................................................................ 33

XVI.   Disclosure Required by the Bankruptcy Code ........................................... 33

XVII.  Fraudulent and Preferential Transfers ....................................................... 33

XVIII. Other Bankruptcies ................................................................................... 34

XIX.   Conclusion ................................................................................................ 34

Disclosure Statement - HC. Jeffries Tower Company, Inc.

## NOTICE TO CREDITORS AND PARTIES IN INTEREST

**THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT, NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATIONS OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE DISTRICT COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

## I.
## Introduction

On August 21, 2017, HC Jeffries Tower Company, Inc. (the "Debtor") filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code (hereinafter the "Code"), in Case Number 17-35027-H5-11. The Debtor has remained in possession of its property pursuant to the provisions of 11 U.S.C. §§1107 and 1141, which provides that the Debtor shall retain possession of and manage its property. Also on August 21, 2017, Ford Steel, LLC filed a Voluntary Petition under Chapter 11 of the Code in Case Number 17-35028-H5-11. On August 23, 2017, the Court entered an Order for Joint Administration of the two Chapter 11 Proceedings. Although they are being jointly administered, each Debtor shall file its own Disclosure Statement and Plan of Reorganization.

The Debtor has retained the law firm of Cooper & Scully, PC, Julie M. Koenig as Lead Counsel for the Debtor, on a $25,000 retainer plus the filing fee of $1,717.00. Cooper & Scully, PC withdrew the sum of $3,228.08 for pre-petition work performed in preparing the case for filing leaving a retainer of $21,771.92. This law firm has continued to represent the Debtor in these proceedings.

The first meeting of creditors pursuant to §341 of the Code was held and concluded on October 26, 2017, at 1:30 p.m. at the United States Trustee's office in Houston, Texas.

This Disclosure Statement ("Disclosure Statement") is provided pursuant to 11 U.S.C. §1125 to all of the Debtor's known creditors and other parties-in-interest in connection with the solicitation of acceptance of the Debtor's Plan of Reorganization, (the "Plan").   This Disclosure Statement contains important information about the Plan.   The purpose of this Disclosure Statement is to provide information to enable a hypothetical, reasonable creditor, typical of the holders of claims in this case, to make an informed judgment in exercising its vote to either accept or reject the Plan.   The Debtor has prepared this Disclosure Statement in order to disclose such information which, in its opinion, is material, important, and necessary to an evaluation of the Plan.

**THE PLAN IS NOT A PART OF THIS DISCLOSURE STATEMENT AND MUST BE REVIEWED INDEPENDENTLY.   THE PLAN CONTAINS AN INJUNCTION PROVISION.**

This Disclosure Statement must be approved by the Bankruptcy Court and/or District Court, after notice and hearing, prior to the solicitation of creditors with respect to their acceptance of the Plan.

Your vote on the Plan is important.   In order for the Plan to be deemed "accepted" by creditors, Sixty-Six and Two-Thirds Percent (66-2/3%) in amount of claims and more than Fifty Percent (50%) in number of claims voting in each class must accept the Plan.   In the event the Plan is not accepted by any class, the Debtor will request confirmation of the Plan in accordance with the provisions of 11 U.S.C. §1129(b).   Whether or not you expect to be present at the

Confirmation Hearing, you are urged to date, sign and mail the Ballot to Julie M. Koenig, 815 Walker, Suite 1040, Houston, Texas 77002, Attorneys for the Debtor.

## II.
## Nature of Chapter 11 Reorganization Proceedings

Chapter 11 of the Bankruptcy Code is a remedial statute designed to effect the rehabilitation and reorganization of financially distressed individuals and entities, or the orderly liquidation of the Debtor's property, to maximize the return to the Debtor's unsecured creditors. The statutory aims of reorganization/liquidation proceedings include the following:

(a)    Preservation of the Debtor's property as a "going concern" and the preservation of any going concern value of the Debtor's business and property;

(b)    Avoidance of the forced and destructive liquidation of the Debtor's assets;

(c)    The protection of the interest of the creditors, both secured and unsecured; and,

(d)    The restructuring of the debts of the Debtor and its finances to enable it to retain those assets necessary to rehabilitate its finances and produce the greatest recovery for its creditors.

While the formulation and confirmation of a Plan of Reorganization or Liquidation is the principal function of a Chapter 11 case, Congress recognized in 11 U.S.C. Section 1123(a)(5)(d), that the sale of all or any part of the property of the estate and the distribution of all or part of the property of the estate among those having an interest in the property is also a legitimate function of a Chapter 11 proceeding.   Therefore, a Plan may affect the interest of all parties and creditors, reject executory contracts, and provide for prosecution and/or settlement of the Debtor's claims against third parties.   For a Plan to be confirmed by the Court, the Code requires that the Court finds that the Plan has received the favorable votes of certain requisite classes and that the Plan be

"fair, equitable and feasible," as to any dissenting classes of creditors.   A more detailed description of the voting requirements of a Plan is set forth on pages 7 - 9 of this Disclosure Statement.

To be determined "fair and equitable", a Plan must comply with the so-called "absolute priority rule".   The absolute priority rule requires that beginning with the most senior rank of claims of creditors against the Debtor, each class in descending rank or priority must receive full and complete compensation before an inferior or junior class may participate in the distribution. The Plan must be accepted by the affirmative vote of a majority of creditors unless adequate provisions are made for the classes of descending creditors.   The foregoing is a brief summary of the requirements for a Plan and should not be relied upon for voting purposes.   Creditors are urged to consult their own counsel before making any decisions on a Plan filed herein.

In addition to the above, 11 U.S.C. §1125 requires that a Debtor compile a Disclosure Statement which provides "adequate information" to creditors before anyone may solicit acceptance of a Chapter 11 Plan.   This Disclosure Statement is prepared in accordance with Section 1125 to provide "adequate information" to the creditors in this proceeding.   Creditors are urged to consult with their own individual counsel or each other and to review all of the pleadings filed in this bankruptcy proceeding in order to fully understand the disclosures made herein, the Plan of Reorganization filed herein, and any other pertinent matters in this proceeding.

This Chapter 11 proceeding is conducted under the supervision of a Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Pursuant to the Code, the Court may:

(a)    Authorize the Debtor, as Debtor-in-Possession, to operate its business and manage its property;

(b)    Permit rejection of executory contracts;

(c)    Authorize the Debtor to issue certificates of indebtedness;

(d)    Authorize the Debtor-in-Possession to lease or sell the property of the Debtor;

(e)    Authorize the Debtor-in-Possession to compromise claims in the Estate;

(f)    Grant or deny relief from the stay or any suit against the Debtor and of any acts or proceedings to enforce a lien against the Debtor's property; and,

(g)    Approve and confirm any Plans of Reorganization.

## III.
## Considerations in Voting on The Chapter 11 Plan

**Operation of Chapter 11**.   Chapter 11 of the Bankruptcy Code permits the adjustment of secured debts, unsecured debts, and equity interests.   A Chapter 11 Plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness or may provide for return of the stock in a Debtor corporation to its equity owners absent full satisfaction of indebtedness provided that an impaired class does not vote against the Plan.

If an impaired class votes against the Plan, implementation of the Plan is not necessarily impossible.   Provided that the Plan is fair and equitable and that each class is afforded treatment as allowed by and defined in the Bankruptcy Code, treatment of a particular class may be very broadly defined as providing to a creditor the full value of its claim.   The value of that creditor's claim is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.   If the latter is equal to or greater than the former, the Plan may be confirmed over the dissent of that class, depending on junior claims and interests.

In the event a class is unimpaired, it is automatically deemed to accept the Plan.   A class is unimpaired if:

1. Its rights after confirmation are the same as existed (or would have existed absent any default) before the commencement of the Chapter 11 case, that any existing defaults are cured or provided for under the plan, and the class is reimbursed actual damages; or

2. The allowed claims of the class are paid in full in cash as they are matured.

If there is no dissenting class, the test for approval by the Court of a Chapter 11 Plan is whether the Plan is in the best interest of the creditors and interest holders and is feasible.

**IN SIMPLE TERMS, A PLAN IS CONSIDERED BY THE COURT TO BE IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS IF THE PLAN WILL PROVIDE A BETTER RECOVERY TO THE CREDITORS AND INTEREST HOLDERS THAN THEY WOULD OBTAIN IF THE DEBTOR WERE LIQUIDATED AND THE PROCEEDS OF THE LIQUIDATION WERE DISTRIBUTED IN ACCORDANCE WITH THE BANKRUPTCY LIQUIDATION PRIORITIES.   IN OTHER WORDS, IF THE PLAN PROVIDES CREDITORS AND INTEREST HOLDERS WITH MONEY OR OTHER PROPERTY OF VALUE EXCEEDING THE PROBABLE DIVIDEND IN LIQUIDATION BANKRUPTCY THEN THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS (THE COURT, IN CONSIDERING THIS FACTOR, IS NOT REQUIRED TO CONSIDER ANY OTHER ALTERNATIVE TO THE PLAN OTHER THAN LIQUIDATION BANKRUPTCY).**

In considering feasibility, the Court is only required to determine whether the Plan can be accomplished by the Debtor.   This entails determining:

A. The availability of cash for payments required at confirmation;

B. The ability of the Debtor to make payments called for under the Plan; and

C. The absence of any other factor which might make it impossible for the Debtor to accomplish that which it promises to accomplish in the Plan as contemplated in the Plan.

In addition, in order to confirm a Plan the Court must find, among other things, that the Plan was proposed in good faith and that the Plan and its proponents are in compliance with the applicable provisions of Chapter 11.

These determinations by the Court occur at the hearing on confirmation of a Plan.   The Court's judgment on these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one or an opinion by the Court regarding any debt instrument or equity interest or security interest issued to creditors under the Plan.   Rather, the Court's judgment is merely that the Plan complies with the applicable Code provisions and has garnered sufficient votes by its creditors for confirmation.

**UPON SATISFACTION OF THE §1129(a) GENERAL CONFIRMATION STANDARDS, BUT EXCLUDING PARAGRAPH (8), THE DEBTOR MAY REQUEST THAT THE COURT CONFIRM THE PLAN OVER THE DISSENT OF A CLASS.   THE COURT IS REQUIRED TO CONFIRM IF THE PLAN MEETS WITH THE CRAM DOWN STANDARDS SET FORTH IN §1129(b).   THIS PROCEDURE IS THE PROCESS BY WHICH A DISSENTING CLASS OF CREDITORS OR INTERESTS IS BOUND BY THE TERMS OF A CHAPTER 11 PLAN WITHOUT ITS CONSENT.   THIS PLAN MAY BE CONFIRMED WITH REFERENCE TO A NON-ACCEPTING IMPAIRED CLASS IF TWO STANDARDS ARE MET:  (1) THE PLAN DOES NOT DISCRIMINATE UNFAIRLY AGAINST THE CLASS, AND (2) THE PLAN IS FAIR AND EQUITABLE WITH REFERENCE TO THE CLASS.   UPON SUCH DETERMINATION, THE COURT WILL BIND THE DISSENTING CREDITOR(S) TO THE PLAN WITHOUT ITS CONSENT.**

## IV.
## History of The Debtor

### A.   Background

*Personal Information:*   Herbert C. Jeffries was raised in Mission Texas. Mr. Jeffries has never been a stranger to hard work, beginning with his first job outside of the family pharmacy working on a dairy farm at age 13. Following the dairy farm, Herbert moved to Corpus Christi

Texas where he worked as many odd labor jobs as he could find including water blasting and painting water towers which is where he first began to work with heights. Working on the water towers placed him in the path of his mentor Kirk, an experienced tower hand that introduced him to the tower industry. Mr. Jeffries worked on many projects with a variety of crews before deciding to branch out on his own. The experience he gained with those tower projects would carry with him into the start of his own business where the value of hard work remains at the forefront of each job, a priority that has been ensured with each employee since. Mr. Jeffries learned how to perform the work that needed to be done efficiently and effectively, a knowledge that he spent the first 28 years of the company's inception teaching to and practicing with the tower crews alongside them at each jobsite.

Mary Jeffries was born and raised in San Antonio, Texas.  After meeting and marrying Herbert Jeffries, she worked alongside him in building both HC Jeffries Tower Company and Ford Steel.  From 1992 to 1999, Mary managed the day to day operations of HC Jeffries Tower Company while Herbert was out in the field erecting towers.   After they purchased Ford Steel in 2006, Mary began managing the day to day operations of both companies.   Over the past 37 years she has worked hard to grow both businesses and meet the daily demands of the job. Mary's duties for both companies include, but are not limited to, conducting budget meetings, manage cash disbursements, check payroll, make tax deposits and file quarterly reports, attend thrice weekly production meetings, manage the administrative personnel, double check Quick Book entries for accuracy, collect receivables when due, manage and negotiate terms with vendors, handle all travel arrangements for Tower personnel to get to and from the job sites, handle all banking and credit transactions, manage all DOT registrations for semi trucks and licensing and

registration for all trucks and trailers, and manage both the office and the plant when Mr. Jeffries is out on jobsites, a common occurrence.

*Corporate Information:*    H.C. Jeffries Tower Company was formed in 1979 by Herbert C. Jeffries as a maintenance and erection service for radio and television antenna towers. Specifically, the maintenance and erection of structures referred to in the industry as "tall towers" which reach heights of 2,000 feet (to offer an example of perspective, the One World Trade Center in New York is the tallest building in the U.S. and the 6th tallest in the world topping out at 1,776 feet).   Working knowledge and practices for an industry such as this cannot be learned in a classroom or quick apprenticeship, it is a precarious trade with little room for forgiveness and ample room for costly mistakes which can only be taught over time with experience and attention to detail.

Mr. Jeffries began working at heights by sandblasting and painting water towers which in turn led to an introduction into the tower industry giving him the experience and desire to start his own company.   H.C. Jeffries Tower Company was formed in 1979 with no more than a wood panel van that had a winch on the front and a strong work ethic far from shy of hard labor. The first tower that was fully erected by the company was a 440' tower in San Antonio for the Checker Cab Company in 1979 and the first tall tower work that the company performed was the installation of an FM radio antenna on a 1500' tower in San Antonio Texas for the local station Magic 105.3. There were many bulb changes and maintenance jobs in the first few years which kept the company moving forward. Mr. Jeffries met his wife Mary in 1982 while she was waitressing at a Jims Diner in San Antonio. Mary was a newly single mother of 2 and would give Mr. Jeffries tip money so he could purchase the fuel for the growing tower company to get to the next job. The couple worked

hard together grooming and building the company as they moved it to Wimberley Texas in 1992. The projects at this time were often very lengthy and Mr. Jeffries, along with the small tower crew, would often come to the Jeffries' house in between locations to enjoy a home cooked meal for a few days while they prepared the equipment for the next job. The company stayed very busy as it picked up momentum and continued to grow. In 1999, the company was moved to Porter Texas to work with Ford Steel Ltd. so that Ford Steel, Ltd. could become the exclusive manufacturer for towers to be erected by the Debtor. It was also in 1999 that the Debtor became incorporated.

By this time the Debtor and Mr. Jeffries were well known within the niche industry to be the preferred call when a job was complicated or when advice was needed. Ford Steel and the Debtor worked side by side until 2006, when the owner of Ford Steel passed away, at which point Mr. Jeffries purchased Ford Steel from the previous owner's widow.   Ford Steel LLC became part of the H.C. Jeffries Tower Company group where it has manufactured towers along with various products for other industries in which it continues to grow and establish itself amongst the Houston manufacturing market.

Today, the Debtor is recognized for successfully performing some of the most precarious projects for the industry in the United States. The tall tower industry is extremely small with the Debtor being one of only 5 companies in the country capable of performing tall tower work.   The work that the Debtor provides is absolutely vital to the radio and television industries although the reward is not without risk as the work is difficult.     Without the proper knowledge and experience, the work is deadly.   There are no textbooks in the tall tower industry, only failures and successes to learn from and with over 40 years of experience, Herbert C. Jeffries and the Debtor are premier sources of knowledge of an important, albeit niche industry.

B.      **Events Leading To The Chapter 11 Filing.**

In September of 2008, the credit markets crashed and oil prices plunged.  This caused major businesses in all aspects of the market, not just oil and gas, to "tighten their belts" and stop all discretionary spending.   A direct result was the reduction in broadcaster's advertising rates and therefor a reduction in capital expenditures, especially the building, repairing and retrofitting of broadcast towers - the heart of the Debtor's business.    Oil prices plunged again in late 2014, and continued to remain low through 2016.    The Debtor's energy related contracts with major corporations were either put on hold or cancelled indefinitely, causing the Debtor to incur debt.   The Debtor tried to restructure its debt but was not successful due to the struggling economy.    The Debtor fell behind on its Federal Income Taxes which, in turn, caused the Internal Revenue Service to begin collection actions on the indebtedness.    When the Debtor was unable to reach a payout agreement with the Internal Revenue Service, it filed under Chapter 11 to gain a reprieve from collection activities, allow it to peacefully reorganize, and formulate a plan for paying its indebtedness over a five year period.

C. **Operation and Present Condition.**

The Debtor is one of five companies named by the Federal Communications Commission (the "FCC") as qualified to do the tallest tower work - up to 2,000 feet in the sky.    The government mandated broadcast Repack, which required many broadcast stations to reposition their broadcast frequency, which translates into higher profits for the Debtor for the next 6 years.

H.C Jeffries Tower Company refers a lot to the FCC Repack wherein a transition of broadcast stations into new channel assignments nationwide is occurring, all of which is funded by the government. The original mandated completion date was 2020 but it is predicted to take much

longer to complete the repack as less than 5 percent of the stations needing conversion have been converted.     To put this in perspective, one third of the stations were supposed to be completed at this time. There are 957 stations that must change and only a handful of crews to do this work. H.C. Jeffries Tower Company is one of the few remaining companies with crews capable of performing the work. There were many small tower crews that attempted to stake a claim in the repack work however they soon figured out that they lacked equipment and qualification in the tall tower field. Also, out of the handful of crews, this push for completing has been to blame as a safety risk, with several qualified crews unfortunately experiencing fatalities since the start of the repack work. These factors have led to an overabundance of work for the tower company, however, with the delays there are only a handful of companies (of which we are completing work for currently) that have either had their approvals from the government at the front of the repack or can afford to front the work cost without immediate government reimbursement. The fact that the repack may take much longer is preferable, as the industry is witnessing, work like this cannot be rushed, if it is rushed people lose their lives. There have been so many requests for work from the company that some of it has to be turned down, which more than indicated there is no shortage of income available for H.C. Jeffries Tower Company.   When more crew members are able to be added then even more work can be performed however, it being a niche business, tower hands are not exactly easy to come by. Experience is a must and unfortunately the job has a tendency to "unsettle" ones nerves and therefore about 1 out of every 7 hands hired end up working out.

   In short, H.C. Jeffries Tower Company is one of only a few companies that are able to perform government mandated work which has a timeline that is long running behind schedule. Tower Company has been waiting a very long time for the repack to kick off and now that it has the work

awarded and available is only limited to how much each crew can complete.   The actual name of the companies for which H.C. Jeffries Tower Company is performing repack work is proprietary and, due to competition in the industry, will not be publically listed in this disclosure statement. Any creditor wanting this information will be required to sign a separate non-disclosure agreement with Tower Company.   For more information on the repack, please refer to:

http://wirelessestimator.com/articles/2018/fccs-2020-repack-deadline-is-questionable-following-first-years-bleak-build/

The Debtor currently leases office and warehouse space from Ford Steel, the other jointly administered Debtor.    The rent is $5,000.00 per month, an amount required by Equitable Life Insurance, the mortgagor on Ford Steel's real property, with improvements. The Debtor currently employs approximately ten tower workers and five administrative personnel.    These consist of two - three tower crews, plus a project manager, a CPA, two accounting personnel, an IT specialist, and the owner/President.

The Debtor continues to operate its business as a going concern.    The Debtor's current employees are:

1.  Herbert C. Jeffries, President, at an annual salary of $260,000.00;

2.  The tower workers who receive $10 - 32.00/hour;

3.  The project manager who manages the tower crews and reports to Mr. Jeffries receives $115,000.00 per year;

4.  A CPA who receives $150,000.00 per year;

5.  The accounting personnel who receive $68,640.00 and 58,240.00, respectively; and,

6.  The IT specialist who receives $28.00/ hour.

Disclosure Statement - HC. Jeffries Tower Company, Inc.

The Debtor shall continue with these employees throughout the pendency of the Chapter 11 Plan with no salary increases[1].   It is important to note that during the pendency of the Chapter 11 proceeding, the Debtor has continued operations using only its cash flow without the need for debtor-in-possession financing.   This is important in that the Debtor, with only the relief from filing the Chapter 11, has been able to reorganize its indebtedness without incurring any new secured and/or priority debt, thereby increasing the probability of a successful reorganization.

**Indebtedness on the filing date:**

As of the date of filing, the Debtor's indebtedness was as follows:

| | | |
|---|---|---|
| 1. | Secured Debt: | $1,486,741.01 |
| 2. | Priority Debt: | $911,657.96 |
| 3. | Undisputed Unsecured Debt: | $894,579.02[2] |
| | **Total:** | **$3,292,977.99** |

## V.
## Anticipated Future of the Debtor

**A.    Liquidation Analysis:**        The Debtor has compiled a "Liquidation Analysis" to predict the outcome and payment to its creditors if the Debtor were to be liquidated under Chapter 7 of Title 11 of the United States Code.   A true and correct copy of the "Liquidation Analysis" is

---

[1]   However, as business increases, the Debtor reserves the right to hire additional employees at the same salary level(s) as disclosed herein.
[2]   This total has been adjusted post-petition as the books and records were reconciled.   It does not include the unsecured debt owed to Ford Steel, LLC, the jointly administered Debtor, in the amount of $2,211,697.07.   It also does not include the debts due to HJ Tower Management, Inc. or Sagebrush Towers, Inc. in the amounts of $62,776.25 and $62,273.40 as these companies are also owned by the Principal of the Debtor and will not receive any payments under the Plan.    .    These companies, although owned by the same Principal as the Debtor, are not affiliated with the Debtor and their operations will neither impact the feasibility nor have any outcome on the success of the Debtor's plan.

attached hereto as Exhibit "A" and incorporated herein by reference.

The Debtor has also prepared an annual five year Cash Flow Projection setting forth estimated revenue, operating expenses and payments to the classes under the proposed Plan. These estimates are based on historical figures, current contracts and predicted profits of the Debtor's business.    The Cash Flow Projection is attached as Exhibit "B".

**B.**        **Absolute Priority Rule:**      The "absolute priority rule" is the rule that states that the holder of any claim or interest that is junior to the claims of an impaired unsecured class of creditors will not receive or retain under the plan on account of their junior claim or interest any property (in this case, the stock in the Debtor) unless all senior claims are paid in full.    Pursuant to the liquidation analysis, the unsecured creditors would receive nothing if this bankruptcy proceeding was converted to a Chapter 7 proceeding, but in this Chapter 11 proceeding, they will be receiving 100% of their claims.   As the unsecured creditor will be paid in full under the Plan, the absolute priority rule does not apply in this proceeding.

**VI.**
**Source of Information for this Disclosure Statement**

The information contained herein has not been subject to a certified audit.   Much of the information, descriptions, values and facts contained herein are derived from the Debtor's principal's experience in the tall tower business, and the unverified opinions of third parties. Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.   This Disclosure Statement contains, in summary, the Plan itself which is controlling in the event of any inconsistencies.   Each creditor is urged to review the Plan prior to voting.

The statements contained in this Disclosure Statement are made as of the date hereof unless

another time is specified herein.    The delivery of this Disclosure Statement shall not, under any circumstances, create an implication that there has not been any change in the facts as set forth herein since the date hereof.   All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

## VII.
## Disclaimer

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, PAST OR FUTURE BUSINESS OPERATIONS, OR THE PLAN ARE AUTHORIZED NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON   IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ACCURACY.   THE FACTUAL INFORMATION REGARDING THE DEBTOR, THE DEBTOR'S ESTATE, ITS ASSETS AND LIABILITIES HAS BEEN DERIVED FROM THE DEBTOR'S RECORDS, THE DEBTOR'S SCHEDULES, PUBLIC RECORDS AND RELATED DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**NEITHER THE DEBTOR NOR ITS COUNSEL CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ANY INACCURACY, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT A FINDING BY THE COURT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE AND COMPLETE.    FURTHER, APPROVAL OF THE DISCLOSURE STATEMENT IS NOT AN INDICATION BY THE COURT OF THE CONFIRMABILITY OF THE PLAN.**

**THE ABILITY OF THE DEBTOR TO ACHIEVE ITS PROJECTIONS IS SUBJECT TO SUBSTANTIAL RISKS FROM SUCH FACTORS AS, BUT NOT LIMITED TO, THE TALL TOWER BUSINESS, THE CONTRACTS RELATED THERETO AND THE ECONOMY; THEREFORE ANY PROJECTIONS PREPARED BY THE DEBTOR**

Disclosure Statement - HC. Jeffries Tower Company, Inc.

**DO NOT CONSTITUTE GUARANTIES OF RESULTS.**

## VIII.
## Professional Fees

The Debtor engaged the law firm of Cooper & Scully, Julie M. Koenig as Lead Counsel, to represent the Debtor in this Chapter 11 proceeding. The Court entered an Order approving retention of the law firm on April 9, 2018, at Docket No. 73[3]. Cooper & Scully received an initial retainer in the amount of $25,000.00 plus the filing fee of $1,107.00. Pre-petition Cooper & Scully withdrew the sum of $3,228.08 for work performed to file the case leaving a retainer of $21,771.92 plus the filing fee.

## IX.
## Description of Assets and Value

A complete listing of all assets is set forth in the Bankruptcy Schedules and Statement of Financial Affairs on file with the United States Bankruptcy Court for the Southern District of Texas, Houston Division. According to these Schedules the Debtor has assets valued at $1,499,104.49. In August of 2016, the WFA Group performed an appraisal of the Debtor's machinery and equipment. The value of the Debtor's machinery and equipment on its Schedules is the fair market value from that appraisal. A complete listing of the Debtor's assets are set forth on Schedule B filed at Docket No. 29. In the unlikely event that Ford Steel's real property is foreclosed upon in accordance with its Plan of Reorganization, Tower Company's personal property will remain property of the reorganized Tower Company.

## X.
## Summary of the Plan

---

[3]   The application to Employ Cooper & Scully was duly filed on the Petition Date, August 21, 2017. The Court inadvertently did not approve the application until April 9, 2018.

The following is a brief summary of certain provisions of the proposed Plan of Reorganization to assure that the creditors affected understand its provisions.  This summary should not be considered as solicitation for acceptance of that Plan.   Additionally, creditors should not rely on this summary to decide whether or not to vote in favor of or against the Plan, but are expressly referred to the Plan itself since it contains many provisions which will not be summarized herein.

The Plan of Reorganization proposes the continuation of the Debtor's business utilizing the profits to fund the plan over a five to ten year period[4].    However, the Debtor reserves the right to pre-pay any class on a pro-rata basis as funds are available over the life of the Plan.

The Debtor's Plan of Reorganization will provide for classification of creditors in accordance with the United States Bankruptcy Code.  The Debtor is in the tall tower fabrication business, a type of construction business.    It is customary in the construction business for a slow-down in business during the holiday period October through December.    This often results in lower revenues during the first three months of the year.  Due to the slow-down during the holiday period, the Debtor reserves the right, in the event it is unable to make the full quarterly or monthly payment to any Class of Creditors in any given year, due to an act of nature such as Hurricane Harvey, to pay the unpaid amount during the remaining three quarters of that year.   The unpaid amount will include interest at the contract, not default, rate if such interest is a provision of an underlying contract between the Debtor and the creditor.    The unpaid amount may be paid in any manner whether it is monthly or in a lump sum provided that it is paid in full within eleven

---

[4]  All priority creditors, the Internal Revenue Service's secured claim, and non-insider unsecured creditors will be paid over a five year period.   Some secured creditors will have a payout not to exceed ten years.    Please refer to a particular class of creditors, infra, for specific treatment of a claim.

months from the missed payment.   Such a delay in payment shall not constitute a default under the Plan of Reorganization.

A.    **Classes under the Plan**

**Class 1- Administrative Expenses - Legal Fees**.   Class 1 is unimpaired.   Class 1 are Claims entitled to priority by Section 507(a)(2) of the Bankruptcy Code and will consist of fees and expenses incurred by the Court appointed Counsel.    These fees are incurred prior to the effective date of the Plan, as the same are finally approved and allowed by final order of the Court, and any other expenses incurred during the course of the Chapter 11 proceeding that have not yet been paid. The members of this class are Cooper & Scully, PC, Counsel for the Debtor.

All claims in this class shall be paid in cash and in full in such amounts as may be allowed and approved by the Court on the effective date or after such claims are finally allowed, whichever is later, by the Debtor to the extent of available funds, or such claims may be paid in accordance with any agreement or waiver.   In either event, claims in this class shall be paid in full within the one (1) year period of the initial plan.   The anticipated total expenses to be paid in this class are anticipated to be $70,000 to $75,000.00.

**Class 2 - The United States Trustee**.    Class 2 is unimpaired and consists of the post-confirmation claim of the office of the United States Trustee for its fees from the date of confirmation until the Chapter 11 file is closed by the Bankruptcy Clerk.   These fees are based on the amount of disbursements made by the Debtor and are paid on a quarterly basis.    The reorganized Debtor shall be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6).    Any fees due as of the date of confirmation of the plan will be paid in full on the effective date of the plan.    After confirmation, the reorganized

Debtor shall pay United States Trustee quarterly fees as they accrue until this case is closed by the Court.    The Debtor shall file with the Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.

All pre-confirmation quarterly fees shall be paid by the effective date of the Plan.

**Class 3 - Priority Claim of the Internal Revenue Service.**    Class 3 is impaired and consists of the priority claim of the Internal Revenue Service in the amount of $906,626.49.   This claim will be paid in equal monthly installments of $18,502.58 within five years from the date of filing[5].    The first payment shall be made on the 15th day of the first full month of the first full quarter following the effective date of the plan and continue until paid in full.

If the reorganized debtor substantially defaults on the plan payments due to the IRS, the outstanding balance is immediately due and payable.    Payments shall be for the entire amount owed to the IRS under the plan.   The IRS may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.

**Class 4A - Secured Claims of the Texas Workforce Commission**.   Class 4A is impaired and consists of the secured claim of the Texas Workforce Commission in the total amount of $3,035.11 with interest at the rate of 6%.   This claim will be paid in a lump sum payment in the third month of the Plan.   The third month is estimated to be September of 2018.   In the event that the payment is later than September of 2018, additional interest at the rate of 6% will be included in the payment.    Upon confirmation, Counsel for the Texas Workforce Commission shall calculate

---

[5]   The five year period begins on the filing date although the payments do not begin until after the effective date.   This payment amount is presuming payments begin in July of 2018.    If the actual payments begin after July of 2018, the amount of the payments will be adjusted upwards to ensure that all payments in this Class are made within 5 years of the filing date.

and inform the Debtor of the exact amount of the payment.

**Class 4B - Secured Claim of Montgomery County**.    Class 4B is impaired and consists of the secured claim of Montgomery County in the amount of $7,090.18 plus interest at the rate of 12%.    This claim will be paid in equal quarterly installments of $1,772.55 over a one year period. The first payment shall be made on the 15th day of the third full month of the first full quarter following the effective date of the plan and continue until paid in full.

Upon confirmation, Counsel for Montgomery County shall calculate and inform the Debtor of the exact amount of the payments.

The claimant in this class shall retain all statutory liens on the Debtor's property. Post-petition secured ad valorem taxes will be paid in the ordinary course of business and failure to do so shall result in a default under the terms of the confirmed Plan.

Default of the Plan shall be defined as the failure of the proponent of the plan to make payments or perform any action required to be made under the terms of the confirmed plan.

In the event of a default, there will be full reinstatement of the administrative collection powers and rights of this ad valorem Taxing Authority as they existed prior to the filing of the bankruptcy petition in this case, including, but not limited to, the assessment of taxes, the filing of Notices of Tax Liens and the powers of levy, seizure and sale.

**Class 4C - Secured Claim of the Texas Comptroller of Public Accounts**.    Class 4C is impaired and consists of the secured claim of the Texas Comptroller of Public Accounts in the amount of $23,643.51 with interest at the rate of 4.75%.    This claim will be paid in equal quarterly installments of $5,910.88 over a one year period.    The first payment shall be made on the 15th day of the first full month of the first full quarter following the effective date of the plan and

continue until paid in full.

### Class 4D - Secured Claim of The Bank & Trust of Bryan/College Station.

Class 4D is impaired. It consists of the secured claim of The Bank & Trust of Bryan/College Station (the "Bank"). The Bank retains a blanket first lien on all Debtor's personal property. Such personal property consists of all Debtor's fixtures, furniture, equipment, inventory, accounts, chattel paper, general intangibles, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind related to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles, and other account proceeds). The Bank also retains a blanket first lien on all the jointly-administered Debtor Ford Steel, LLC's furniture, fixtures, equipment, inventory, accounts, chattel paper, general intangibles, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind related to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles, and other account proceeds).

The Bank's claim shall be treated in accordance with Class 4C of the jointly-administered debtor Ford Steel, LLC's plan or reorganization. However, should the jointly-administered debtor Ford Steel, LLC default in payments to the Bank under that debtor's plan of reorganization, the injunction under this Debtor's Plan and the injunction under the jointly-administered debtor's plan of reorganization shall lift to allow the Bank to foreclose on its collateral owned by this Debtor and the jointly-administered debtor under applicable state law.    However, the Bank shall foreclose on its collateral held by Ford Steel first, applying the proceeds of the sale of that collateral to the Bank's claim.    If the Bank's claim is not fully satisfied from the proceeds of the sale of the Ford

Steel collateral, the Bank may then proceed to forclose on its collateral owned by this Debtor unless other payment arrangements, acceptable to Bank, are offered by this Debtor.

Until such time as the Bank's claim is paid in full, the Debtor shall provide the Bank by the tenth day of each month, through its counsel, with monthly balance sheets, income statements, cash flow statements, and reports of the Debtor's Accounts Receivable as of the last day of the preceding month. Such accounts receivable reports shall contain the entity owing the money to the Debtor, the amount each entity owes the Debtor, and contact information including telephone number and mailing address of each entity.

**Class 4E - Secured Claim of The Internal Revenue Service**.   Class 4E is impaired and consists of the secured claim of the Internal Revenue Service ("IRS") amount of $777,929.16.

This claim will be paid in equal monthly installments of $18,331.43 with interest at the rate of 5% within five years from the date of filing.    The first payment shall be made on the 15th day of the first full month of the first full quarter following the effective date of the plan and continue until paid in full, a period of 49 months.

If the reorganized debtor substantially defaults on the plan payments due to the IRS, the outstanding balance is immediately due and payable.    Payments shall be for the entire amount owed to the IRS under the plan.   The IRS may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.

**Class 5 - Unsecured Claims under $1,000.01.**    Class 5 is impaired and consists of the unsecured claims under $1,000.01.   There are 2 claims in this class for a total of $1,607.43.    The claimants in this class are:

1.       NDL Chicago...........................................................................................$ 665.88
2.       Nott, Ltd...................................................................................................941.55

Disclosure Statement - HC. Jeffries Tower Company, Inc.

Total  ............................................................................................................. $1,607.43

These claims shall be paid in full on the first full month of the first fill quarter following the effective date of the Plan.

Any member of Class 6 who agrees to reduce their claim to $1,000.00 may elect to be treated in Class 5 of the Plan.   The election to accept treatment in Class 5 **shall be made in writing on the ballot**.   The election to be treated in Class 5 by a Class 6 creditor is an election to accept $1,000.00 in **full satisfaction of their entire claim.**

**Class 6 - Unsecured Claims over $1,000.00.**   Class 6 is impaired and consists of the unsecured claims over $1,000.00.   These claims total approximately $892,971.59.   These claims shall be paid 100% of their claims in equal quarterly installments over a 5 year period.   The first payment shall be made on the 15th day of the third full month of the first full quarter following the effective date of the plan.   The anticipated quarterly installment to these creditors is in the amount of $44,649.00.

Any member of Class 6 who agrees to reduce their claim to $1,000.00 may elect to be treated in Class 5 of the Plan.   The election to accept treatment in Class 5 **shall be made in writing on the ballot**.   The election to be treated in Class 5 by a Class 6 creditor is an election to accept $1,000.00 in **full satisfaction of their entire claim.**

**Class 7 - Equity Security Holders.**   Class 7 is impaired and consists of the equity security holder of the Debtor, Herbert Jeffries.   As the Debtor is paying 100% to the unsecured creditors, Mr. Jeffries will retain his interest in the Reorganized Debtor.

**B.**      **Other Provisions**

Notwithstanding confirmation of the Plan, the Court will retain jurisdiction (i) to determine

the allowance of claims upon objection by a party-in-interest; (ii) to determine requests for payment of administrative claims and expenses, including compensation, entitled to priority under §507(a)(i) of the Code; (iii) to resolve disputes regarding interpretation of the Plan; (iv) to modify the Plan; (v) to implement provisions of the Plan; (vi) to adjudicate any cause of action brought by the Debtor or Trustee as representatives of the estate; (vii) to enter a final decree; and (viii) for other purposes.

### C. Bar dates for filing proofs of claim

Any creditor desiring to receive a distribution under the provisions of this Plan, and whose claim is not evidenced by a court order or set forth on the Debtor's schedules, must have filed a proof of claim or request for compensation with the Bankruptcy Court **not later than January 24, 2018**. The proof of claim deadline for governmental entities is April 2, 2018.

These bar dates are set by the Bankruptcy Court and noticed to all creditors pursuant to the Notice of Creditor's Meeting.

The Debtor has filed as a part of its schedules a list of all creditors, setting forth the identity of each creditor and an indication of the amount due each creditor. Unless a claim is listed as disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on the Debtor's schedules. Any creditor who disputes the amount listed on the Debtor's schedules must have filed a proof of claim in a different amount or status not later than January 24, 2018, or not later than April 2, 2018, for governmental entities. Failure to have filed a timely proof of claim will force a creditor to accept the amount of his/her claim as listed on the Debtor's schedules.

Claims listed as **disputed, contingent, or unliquidated** will not be allowed unless a proof of claim with all supporting documents was filed prior to January 24, 2018, or prior to April 2,

2018, for governmental entities.   In the event a creditor has filed a proof of claim in these proceedings with which the Debtor disagrees, the Debtor has the option to file an objection to that claim and request the Court to determine the true value of the claim.   The Debtor shall attempt to resolve all objections to claims prior to confirmation.   However, the Debtor shall have 60 days from the effective date of the plan to file objections to claims.

Any claim for a debt listed on the Debtor's Schedules as **disputed, contingent, or unliquidated** for which a proof of claim is not timely filed shall be of **no force and effect**.   No distribution will be made to any creditor that has not timely complied with this provision.

## XI.
## Pending Litigation

There are two pending lawsuits against the Debtor, both of which have been stayed pursuant to 11 U.S.C. §362(a) and the automatic stay has not been lifted on those proceedings.   The lawsuits are: (1) *The Bank & Trust of Bryan/College Station vs. HC Jeffries Tower Company, Ford Steel, LLC and Herbert Jeffries*, Cause No. 17-001700-CV-85 in the 85th District Court of Brazos County, Texas and (2) *United Healthcare Insurance Company vs. H.C. Jeffries Tower Company, Inc.*, Cause NO. 16-06-07484 in the 410th Judicial District Court of Montgomery County, Texas.    The Plaintiff in these cases shall be bound by the Debtor's Plan of Reorganization and shall take nothing against any third part defendants provided that the Debtor is paying its creditors, including the Bank, under its confirmed plan.    In the event of default under this Plan, Plaintiff is not bound by this Plan of Reorganization.

## XII.
## Alternatives to the Plan Proposed

The Debtor expects that the Plan will enable it to realize the maximum benefits for all of its creditors.   However, if the Plan is not confirmed, the Debtor will continue to seek other avenues for reorganization.

### A.      Conversion

In the event no suitable alternative can be found, the Debtor would be compelled, as well as obligated, to recommend the conversion of the Chapter 11 case to a case under Chapter 7, and a subsequent liquidation by a duly appointed or elected Chapter 7 trustee.   The plan provides that property of the estate will vest in the reorganized Debtor thirty days after entry of the final confirmation order.   Creditors shall retain their ability to utilize rights under 11 U.S.C. § 1112(b)(8) to request conversion.   Upon a conversion of this case to Chapter 7, all property re-vested in the Debtor under the Plan, or subsequently acquired, shall constitute property of the bankruptcy estate in the converted case.    Although the Debtor is of the opinion that a straight liquidation of the assets would not be in the best interest of the creditors generally, the following is likely to occur:

(i)      The newly appointed Chapter 7 trustee would have to become familiar with the Debtor's operations in order to evaluate all the Debtor's assets and liabilities;

(ii)      In addition to the duplication of efforts that would transpire as a result of the Chapter 7 Trustee having to review documents and interview persons in order to become sufficiently acquainted with the Debtor's business, the Chapter 7 Trustee would likely retain professionals to aid in administering the estate;

(iii)      An additional tier of administrative expenses entitled to priority over general unsecured claims would be incurred.   Such administrative expenses would include Chapter 7 Trustee's commissions and fees for the professionals

likely to be retained; and

(iv)    There would likely be no distribution at all to the creditors until the case is ready to be closed in approximately two (2) more years.

The Debtor will allow the creditors and parties-in-interest to draw their own conclusions with respect to the delay associated with a Chapter 7 liquidation.   It is certain that the above factors would result in an additional dilution to the projected dividend.   The Debtor believes that such a speculative projection should be made by the creditors themselves.

The Debtor believes if the assets of the Debtor were liquidated through a court trustee the payments to creditors would be less than provided in this Plan.

### B.    Dismissal

Dismissal of the proceeding would, in the Debtor's opinion, lead to an unsatisfactory result.

The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor.   The vote on the Plan does not include a vote on alternatives to the Plan.   There is no assurance what turn the proceedings will take if the Plan is rejected.   If you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should consult your counsel.

The economy is the only risk posed to creditors that would result in an amendment or change in the plan.

### C.    Default

Upon confirmation of a Chapter 11 Plan, the Plan operates as a contract between the Debtor and its creditors.   A default occurs if the Debtor fails to make any required payments contained in the Plan.   Each creditor, regardless of class, has the right upon a default under the plan to notify the

Debtor and its Counsel of the default and allow 14 days for the Debtor to cure such default.   Notice of default must be made in writing to the Debtor and its Counsel and delivered by messenger or overnight delivery, with delivery completed (and the notice clock started) when it is delivered during normal business hours to the Debtor or Reorganized Debtor and its counsel. If no one is there (or if no one agrees to accept delivery) during normal business hours, then leaving the notice there during normal business hours would constitute completion of delivery.   Notice of default shall be given to the following:

> Mr. Herbert C. Jeffries
> 24900 Ford Road
> Porter, Texas 77365
>
> > and
>
> Julie M. Koenig
> 815 Walker, Suite 1040
> Houston, Texas 77002

If the Debtor fails to cure the default within the 14 day period, the Creditor sending notice of default has the right to bring a lawsuit in the State District Court in Montgomery County, Texas against the Debtor or to apply to the Federal Bankruptcy Court for relief.

## XIII.
## Federal Income Tax Consequences to Creditors and the Debtor

### A.      Federal Tax Consequences to Creditors

The Debtor believes that the following discussion generally sets forth the Federal income tax consequences to Creditors upon confirmation and consummation of the Plan.   No ruling has been sought or obtained by the Debtor from the IRS with respect to any of these matters.   The following discussion of Federal income tax consequences is not binding on the IRS and is general in

nature.  No statement can be made herein with respect to the particular Federal income tax consequences to any Creditor.

AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.

Creditors may be taxed on distributions they receive from the Estate.  The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor.  The method of accounting utilized by a Creditor for Federal income tax purposes may also affect the tax consequences of a distribution.  In general, the amount of gain (or loss) recognized by any such Creditor distributee will be the difference between (i) the Creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received.  Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

B.     **Federal Tax Consequences to the Debtor**

As the Debtor is considered insolvent within the 90 days prior to filing its Chapter 11 Proceeding, there will not be any tax consequences for "forgiveness of debt".  There are no tax consequences to the Debtor as a result of its filing for Chapter 11 Reorganization nor will there be any tax consequences as a result of completing its Plan of Reorganization.

## XIV.
## Means for Implementation and Execution of the Plan

Implementation of the Plan requires entry of an order by the Bankruptcy Court confirming

the Plan.  The Plan is to be implemented, if accepted and approved by the Bankruptcy Court, in its entire form as filed on April 20, 2018.     The effective date of the plan shall be 30 days after the date the Plan is confirmed by this Court.

## XV.
## Modification of Disclosure

The Debtor may propose amendments to or modification of this Disclosure Statement at any time prior to the confirmation, with leave of the Court.  After confirmation, the proponent may, with the approval of the Court, so long as it does not materially or adversely affect the interests of the creditors or other parties-in-interest as set forth herein, remedy any defect or omission, reconcile any inconsistencies in this Disclosure Statement, or in the Order Confirming Disclosure Statement, in such a manner as may be necessary to carry out the purposes and intent of this Disclosure Statement.

## XVI.
## Disclosure Required by the Bankruptcy Code

The Bankruptcy Code requires the disclosure to the Bankruptcy Court of payments made or promised of the kind as set forth in Section 1129(a)(5) of the Bankruptcy Code.  The Debtor retained Julie M. Koenig, Cooper & Scully, PC, as bankruptcy counsel on a $25,000 retainer, of which $21,771.92 remained post-petition.  The Bankruptcy Code requires that the Court approve all professional's fee applications prior to payment by a Debtor.  Therefore all fees and costs incurred are subject to approval of the Bankruptcy Judge.

## XVII.
## Fraudulent and Preferential Transfers

To the best of Debtor's knowledge and belief there have not been any fraudulent or preferential transfers within one year of the bankruptcy filing.

## XVIII.
## Other Bankruptcies

The Debtor has not filed a prior bankruptcy.

## XIX.
## Conclusion

The Debtor believes that approval of its Plan will provide an opportunity for its creditors to receive more money in the foreseeable future on their claims than would be received in a straight liquidation by a Trustee in a Chapter 7 case or from a distress sale of all the assets.   If the Plan is not approved, the Debtor will continue to seek other reorganization alternatives, but liquidation might ensue, with the consequences as discussed above in relation to the liquidation alternative.

This Disclosure Statement is subject to the approval by the Bankruptcy Court after notice and hearing.

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The Plan of Reorganization contains additional provisions and each creditor should review the provisions of the Plan with particularity.

Respectfully submitted this 7th day of June, 2018.

**H.C. Jeffries Tower Company, Inc.**

By:_____ */s/ Herbert C. Jeffries, President*_____
Herbert C. Jeffries, President

OF COUNSEL:

**COOPER & SCULLY, PC.**

By: */s/    Julie M. Koenig*
    Julie M. Koenig
    State Bar No. 14217300
    815 Walker, Suite 1040
    Houston, Texas 77002
    713/236-6800 (Telephone)
    713/236-6880 (Telecopier)
    Julie.Koenig@cooperscully.com

    Attorneys for the Debtor