**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| H.C. JEFFRIES TOWER | § | CASE NO. 17-35027-H5-11 |
| COMPANY, INC. | § | (Chapter 11) |
| Debtor | § | |
| | § | |
| FORD STEEL, LLC. | § | CASE NO. 17-35028 |
| Debtor | § | (Chapter 11) |
| | § | JUDGE RODRIGUEZ |
| | § | |
| | § | JOINTLY ADMINISTERED UNDER |
| | § | CASE NO. 17-35027-H5-11 |

_____

## Debtor Ford Steel, LLC's Third Amended Disclosure Statement
_____

Comes now FORD STEEL, LLC., Debtor-in-Possession herein, and files this Third

Amended Disclosure Statement pursuant to the provisions of Section 1125 of Title 11 of the

United States Code.

### Table of Contents

| | Topic | Page |
|---|---|---|
| I. | Introduction | 4 |
| II. | Nature of Chapter 11 Reorganization Proceedings | 6 |
| III. | Consideration in Voting on Chapter 11 Plan | 8 |
| IV. | History of the Debtor | 10 |
| | A. Background | 10 |
| | B. Events Leading to Chapter 11 Filing | 13 |
| | C. Operation and Present Condition of the Debtor While in Chapter 11 | 15 |

V.          Anticipated Future of the Debtor   .......................................................18

            A.     Liquidation Analysis   ...............................................................18

            B.     Absolute Priority Rule   ............................................................20

VI.         Source of information for this Disclosure Statement   ..........................20

VII.        Disclaimer   ...........................................................................................21

VIII.       Professional Fees   .................................................................................22

IX.         Description of Assets   ...........................................................................22

X.          Summary of Plan   .................................................................................22

            A.     Classes under the Plan .............................................................. 23

            B.     Other Provisions   ....................................................................33

            C.     Bar Dates for Filing Proof of Claims   .....................................33

XI.         Pending Litigation   ...............................................................................34

XII.        Alternatives to the Plan Proposed   .......................................................35

            A.     Conversion   .............................................................................35

            B.     Dismissal   ................................................................................36

            C.     Default   ....................................................................................37

XIII.       Federal Income Tax Consequences to Creditors & Debtor   .................37

XIV.        Means for Implementation and Execution of the Plan   .........................39

XV.         Modification of Disclosure   ..................................................................39

XVI.        Disclosure Required by the Bankruptcy Code   .....................................39

XVII.       Fraudulent and Preferential Transfers   .................................................40

XVIII.      Other Bankruptcies   ..............................................................................40

Disclosure Statement - Ford Steel, LLC

XIX.        Conclusion  ...........................................................................................................40

Disclosure Statement - Ford Steel, LLC

**NOTICE TO CREDITORS AND PARTIES IN INTEREST**

**THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT, NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN.  ANY REPRESENTATIONS OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE DISTRICT COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

**I.**
**Introduction**

On August 21, 2017, the Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code (hereinafter the "Code"), in Case Number 17-35028-H5-11.  The Debtor has remained in possession of its property pursuant to the provisions of 11 U.S.C. §§1107 and 1141, which provides that the Debtor shall retain possession of and manage its property.  Also on August 21, 2017, H.C. Jeffries Tower Company, Inc. filed a Voluntary Petition under Chapter 11 of the Code in Case Number 17-35027-H5-11.   On August 23, 2017, the Court entered an Order for Joint Administration of the two Chapter 11 Proceedings under Case Number 17-35027-H5-11. Although they are being jointly administered, each Debtor shall file its own Disclosure Statement and Plan of Reorganization.

The Debtor has retained the law firm of Cooper & Scully, PC, Julie M. Koenig as Lead Counsel for the Debtor, on a $25,000 retainer plus the filing fee of $1,717.00.   Cooper & Scully, PC withdrew the sum of $1,260.58 for pre-petition work performed in preparing the case for filing leaving a retainer of $23,739.42.   This law firm has continued to represent the Debtor in these proceedings.

The first meeting of creditors pursuant to §341 of the Code was held and concluded on October 26, 2017, at 1:30 p.m. at the United States Trustee's office in Houston, Texas.

This Disclosure Statement ("Disclosure Statement") is provided pursuant to 11 U.S.C. §1125 to all of the Debtor's known creditors and other parties-in-interest in connection with the solicitation of acceptance of the Debtor's Plan of Reorganization, (the "Plan") filed by Ford Steel, LLC, Debtor-in-Possession.   This Disclosure Statement contains important information about the Plan.   The purpose of this Disclosure Statement is to provide information to enable a hypothetical, reasonable creditor, typical of the holders of claims in this case, to make an informed judgment in exercising its vote to either accept or reject the Plan.   The Debtor has prepared this Disclosure Statement in order to disclose such information which, in its opinion, is material, important, and necessary to an evaluation of the Plan.

**THE PLAN IS NOT A PART OF THIS DISCLOSURE STATEMENT AND MUST BE REVIEWED INDEPENDENTLY.   THE PLAN CONTAINS AN INJUNCTION PROVISION.**

This Disclosure Statement must be approved by the Bankruptcy Court and/or District Court, after notice and hearing, prior to the solicitation of creditors with respect to their acceptance of the Plan.

Your vote on the Plan is important.   In order for the Plan to be deemed "accepted" by creditors, Sixty-Six and Two-Thirds Percent (66-2/3%) in amount of claims and more than Fifty Percent (50%) in number of claims voting in each class must accept the Plan.   In the event the Plan is not accepted by any class, the Debtor will request confirmation of the Plan in accordance with the provisions of 11 U.S.C. §1129(b).   Whether or not you expect to be present at the

Confirmation Hearing, you are urged to date, sign and mail the Ballot to Julie M. Koenig, 815 Walker, Suite 1040, Houston, Texas 77002, Attorney for the Debtor.

## II.
## Nature of Chapter 11 Reorganization Proceedings

Chapter 11 of the Bankruptcy Code is a remedial statute designed to effect the rehabilitation and reorganization of financially distressed individuals and entities, or the orderly liquidation of the Debtor's property, to maximize the return to the Debtor's unsecured creditors. The statutory aims of reorganization/liquidation proceedings include the following:

(a)     Preservation of the Debtor's property as a "going concern" and the preservation of any going concern value of the Debtor's business and property;

(b)     Avoidance of the forced and destructive liquidation of the Debtor's assets;

(c)     The protection of the interest of the creditors, both secured and unsecured; and,

(d)     The restructuring of the debts of the Debtor and its finances to enable it to retain those assets necessary to rehabilitate its finances and produce the greatest recovery for its creditors.

While the formulation and confirmation of a Plan of Reorganization or Liquidation is the principal function of a Chapter 11 case, Congress recognized in 11 U.S.C. Section 1123(a)(5)(d), that the sale of all or any part of the property of the estate and the distribution of all or part of the property of the estate among those having an interest in the property is also a legitimate function of a Chapter 11 proceeding.   Therefore, a Plan may affect the interest of all parties and creditors, reject executory contracts, and provide for prosecution and/or settlement of the Debtor's claims against third parties.   For a Plan to be confirmed by the Court, the Code requires that the Court finds that the Plan has received the favorable votes of certain requisite classes and that the Plan be

Disclosure Statement - Ford Steel, LLC

"fair, equitable and feasible," as to any dissenting classes of creditors.   A more detailed description of the voting requirements of a Plan is set forth on pages 7 - 9 of this Disclosure Statement.

To be determined "fair and equitable", a Plan must comply with the so-called "absolute priority rule".   The absolute priority rule requires that beginning with the most senior rank of claims of creditors against the Debtor, each class in descending rank or priority must receive full and complete compensation before an inferior or junior class may participate in the distribution. The Plan must be accepted by the affirmative vote of a majority of creditors unless adequate provisions are made for the classes of descending creditors.   The foregoing is a brief summary of the requirements for a Plan and should not be relied upon for voting purposes.   Creditors are urged to consult their own counsel before making any decisions on a Plan filed herein.

In addition to the above, 11 U.S.C. §1125 requires that a Debtor compile a Disclosure Statement which provides "adequate information" to creditors before anyone may solicit acceptance of a Chapter 11 Plan.   This Disclosure Statement is prepared in accordance with Section 1125 to provide "adequate information" to the creditors in this proceeding.   Creditors are urged to consult with their own individual counsel or each other and to review all of the pleadings filed in this bankruptcy proceeding in order to fully understand the disclosures made herein, the Plan of Reorganization filed herein, and any other pertinent matters in this proceeding.

This Chapter 11 proceeding is conducted under the supervision of a Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Pursuant to the Code, the Court may:

(a)   Authorize the Debtor, as Debtor-in-Possession, to operate its business and manage its property;

(b)   Permit rejection of executory contracts;

(c)   Authorize the Debtor to issue certificates of indebtedness;

(d)   Authorize the Debtor-in-Possession to lease or sell the property of the Debtor;

(e)   Authorize the Debtor-in-Possession to compromise claims in the Estate;

(f)   Grant or deny relief from the stay or any suit against the Debtor and of any acts or proceedings to enforce a lien against the Debtor's property; and,

(g)   Approve and confirm any Plans of Reorganization.

## III.
## Considerations in Voting on The Chapter 11 Plan

**Operation of Chapter 11**.   Chapter 11 of the Bankruptcy Code permits the adjustment of secured debts, unsecured debts, and equity interests.   A Chapter 11 Plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness or may provide for return of the stock in a Debtor corporation to its equity owners absent full satisfaction of indebtedness provided that an impaired class does not vote against the Plan.

If an impaired class votes against the Plan, implementation of the Plan is not necessarily impossible.   Provided that the Plan is fair and equitable and that each class is afforded treatment as allowed by and defined in the Bankruptcy Code, treatment of a particular class may be very broadly defined as providing to a creditor the full value of its claim.   The value of that creditor's claim is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.   If the latter is equal to or greater than the former, the Plan may be confirmed over the dissent of that class, depending on junior claims and interests.

Disclosure Statement - Ford Steel, LLC

In the event a class is unimpaired, it is automatically deemed to accept the Plan.   A class is unimpaired if:

1.   Its rights after confirmation are the same as existed (or would have existed absent any default) before the commencement of the Chapter 11 case, that any existing defaults are cured or provided for under the plan, and the class is reimbursed actual damages; or

2.   The allowed claims of the class are paid in full in cash as they are matured.

If there is no dissenting class, the test for approval by the Court of a Chapter 11 Plan is whether the Plan is in the best interest of the creditors and interest holders and is feasible.

**IN SIMPLE TERMS, A PLAN IS CONSIDERED BY THE COURT TO BE IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS IF THE PLAN WILL PROVIDE A BETTER RECOVERY TO THE CREDITORS AND INTEREST HOLDERS THAN THEY WOULD OBTAIN IF THE DEBTOR WERE LIQUIDATED AND THE PROCEEDS OF THE LIQUIDATION WERE DISTRIBUTED IN ACCORDANCE WITH THE BANKRUPTCY LIQUIDATION PRIORITIES.   IN OTHER WORDS, IF THE PLAN PROVIDES CREDITORS AND INTEREST HOLDERS WITH MONEY OR OTHER PROPERTY OF VALUE EXCEEDING THE PROBABLE DIVIDEND IN LIQUIDATION BANKRUPTCY THEN THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS (THE COURT, IN CONSIDERING THIS FACTOR, IS NOT REQUIRED TO CONSIDER ANY OTHER ALTERNATIVE TO THE PLAN OTHER THAN LIQUIDATION BANKRUPTCY).**

In considering feasibility, the Court is only required to determine whether the Plan can be accomplished by the Debtor.   This entails determining:

A.   The availability of cash for payments required at confirmation;

B.   The ability of the Debtor to make payments called for under the Plan; and

C.   The absence of any other factor which might make it impossible for the Debtor to accomplish that which it promises to accomplish in the Plan as contemplated in the Plan.

In addition, in order to confirm a Plan the Court must find, among other things, that the Plan was proposed in good faith and that the Plan and its proponents are in compliance with the applicable provisions of Chapter 11.

These determinations by the Court occur at the hearing on confirmation of a Plan. The Court's judgment on these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one or an opinion by the Court regarding any debt instrument or equity interest or security interest issued to creditors under the Plan. Rather, the Court's judgment is merely that the Plan complies with the applicable Code provisions and has garnered sufficient votes by its creditors for confirmation.

**UPON SATISFACTION OF THE §1129(a) GENERAL CONFIRMATION STANDARDS, BUT EXCLUDING PARAGRAPH (8), THE DEBTOR MAY REQUEST THAT THE COURT CONFIRM THE PLAN OVER THE DISSENT OF A CLASS. THE COURT IS REQUIRED TO CONFIRM IF THE PLAN MEETS WITH THE CRAM DOWN STANDARDS SET FORTH IN §1129(b). THIS PROCEDURE IS THE PROCESS BY WHICH A DISSENTING CLASS OF CREDITORS OR INTERESTS IS BOUND BY THE TERMS OF A CHAPTER 11 PLAN WITHOUT ITS CONSENT. THIS PLAN MAY BE CONFIRMED WITH REFERENCE TO A NON-ACCEPTING IMPAIRED CLASS IF TWO STANDARDS ARE MET: (1) THE PLAN DOES NOT DISCRIMINATE UNFAIRLY AGAINST THE CLASS, AND (2) THE PLAN IS FAIR AND EQUITABLE WITH REFERENCE TO THE CLASS. UPON SUCH DETERMINATION, THE COURT WILL BIND THE DISSENTING CREDITOR(S) TO THE PLAN WITHOUT ITS CONSENT.**

## IV.
## History of The Debtor

### A.    Background

*Personal Information:*    Herbert C. Jeffries was raised in Mission Texas. Mr. Jeffries has never been a stranger to hard work, beginning with his first job outside of the family pharmacy working on a dairy farm at age 13.   Following the dairy farm, Herbert moved to Corpus Christi

Texas where he worked as many odd labor jobs as he could find including water blasting and painting water towers which is where he first began to work with heights. Working on the water towers placed him in the path of his mentor Kirk, an experienced tower hand that introduced him to the tower industry. Mr. Jeffries worked on many projects with a variety of crews before deciding to branch out on his own. The experience he gained with those tower projects would carry with him into the start of his own business where the value of hard work remains at the forefront of each job, a priority that has been ensured with each employee since. Mr. Jeffries learned how to perform the work that needed to be done efficiently and effectively, a knowledge that he spent the first 28 years of the company's inception teaching to and practicing with the tower crews alongside them at each jobsite.

Mary Jeffries was born and raised in San Antonio, Texas.   After meeting and marrying Herbert Jeffries, she worked alongside him in building both HC Jeffries Tower Company and Ford Steel.   From 1992 to 1999, Mary managed the day to day operations of HC Jeffries Tower Company while Herbert was out in the field erecting towers.    After they purchased Ford Steel in 2006, Mary began managing the day to day operations of both companies.   Over the past 37 years she has worked hard to grow both businesses and meet the daily demands of the job. Mary's duties for both companies include, but are not limited to, conducting budget meetings, manage cash disbursements, check payroll, make tax deposits and file quarterly reports, attend thrice weekly production meetings, manage the administrative personnel, double check Quick Book entries for accuracy, collect receivables when due, manage and negotiate terms with vendors, handle all travel arrangements for Tower personnel to get to and from the job sites, handle all banking and credit transactions, manage all DOT registrations for semi trucks and licensing and

Disclosure Statement - Ford Steel, LLC

registration for all trucks and trailers, and manage both the office and the plant when Mr. Jeffries is out on jobsites, a common occurrence.

*Corporate Information:*   On August 24, 2006, Herbert Jeffries purchased the assets of Ford Steel, Ltd. and formed Ford Steel, LLC ("Ford Steel" or the "Debtor").   Since purchasing the assets, Ford Steel has become AISC certified steel fabricator using state-of-the-art CNC machinery. It fabricates platforms, skids, ladders, communication/broadcast towers, and custom fabrication for oil, petrochemical, broadcast industries and other customers worldwide.

Mr. Jeffries' company, HC Jeffries Tower Company was leasing space from Ford Steel, Ltd. at the time, and Ford Steel Ltd. was the provider of the structural steel and fabricated towers for HC Jeffries Tower Company.   The owner of Ford Steel passed away, at which point Mr. Jeffries purchased Ford Steel. Ltd. from the previous owner's widow and renamed it Ford Steel, LLC.   Mr. Jeffries was able to secure 100% financing for the assets from a start-up bank in Bryan/College Station, Texas called Texas Enterprise Bank (the "Bank").   Over the first two years, the Bank suffered economic problems and brought in Equitable Life and Casualty Insurance Company, Utah, ("Equitable") to take the Bank's note.   Ford Steel refinanced the note with Equitable.   One condition from Equitable for the refinance was that Ford Steel, was to expand and nearly double the size of the steel plant.   The Bank agreed to give Ford Steel a new line of credit in the amount of one million dollars which, combined with the six hundred thousand to be provided by Equitable Life and Casualty, would provide the funds to finance the expansion of the steel plant.

However, instead of providing the one million dollars in new line of credit at the time of the refinancing with Equitable, the Bank called Ford Steel's equipment notes and small line of credit, causing Ford Steel to have to fund one million dollars of the expansion out of its current cash flow.

Disclosure Statement - Ford Steel, LLC

This was just after the credit crash of late 2008, and severely impacted Ford Steel, LLC's future cash flow.   Ultimately Bank & Trust of Bryan/College Station ("Bank & Trust") purchased the Bank's notes and line of credit from the FDIC after the Bank failed, which is the basis for the indebtedness to Bank & Trust in Class 4C of the Plan.

      **B.**     <u>Events Leading To The Chapter 11 Filing.</u>

In September of 2008, the credit markets crashed and oil prices plunged.  This caused major businesses in all aspects of the market, not just oil and gas, to "tighten their belts" and stop all discretionary spending.   A direct result was the reduction in broadcaster's advertising rates and therefor a reduction in capital expenditures, especially the building, repairing and retrofitting of broadcast towers - the steel fabrication of which is a large part of the Debtor's business.   Other, third party manufacturers followed suit and the demand for steel manufacturing declined dramatically.

Oil prices plunged again in late 2014, and continued to remain low through 2016.   The Debtor's energy related contracts with major corporations were either put on hold or cancelled indefinitely, causing the Debtor to incur debt to maintain operations.   The Debtor tried to restructure its debt but was not successful due to the struggling economy.   The Debtor fell behind on its Federal Income Taxes which, in turn, caused the Internal Revenue Service to begin collection actions on the indebtedness.

At the same time the Debtor's cash flow problems persisted, it became delinquent on the note to Equitable.  For a period of months, the Debtor was working verbally with Equitable to "catch up" on the note by making one and one-half note payments each month.   In April of 2017, the Debtor learned for the first time that Equitable was under new ownership.   In June of 2017, the

Debtor was informed that Equitable had enlisted Greg Hahn from Winthrop Capital Management to act as chief investment officer for Equitable and would be in charge of the note with the Debtor. Also in June of 2017, Mr. Hahn provided the Debtor with a forbearance agreement and, the Debtor contends, threatened foreclosure on the Debtor's steel plant and underlying real property if the Debtor did not agree to default interest in the additional amount of $536,444.41 being added to the indebtedness.   Ultimately, on July 12, 2017, the Debtor executed a Forbearance Agreement which the Debtor contends, among other things, increased the indebtedness on the underlying note by $753,008.14[1] and increased the monthly payment by an additional $500.00 for a forbearance fee.

It is the Debtor's position that it was forced to sign the Forbearance Agreement under duress and the threat of foreclosure on its steel plant and underlying real property; that Equitable failed to give proper notice of any default as required by the underlying note that would trigger the imposition of default interest, compounded interest, late charges and attorney's fees; that under the principals of waiver and estoppel Equitable is foreclosed from charging default and compound interest, late charges and attorney's fees; and that the execution of the Forbearance Agreement was within the ninety-day period such that it is a preference pursuant to 11 U.S.C. §547 and therefore is voidable.

Equitable disputes the foregoing contentions, positions and beliefs of the Debtor.   It is Equitable's position that its actions have been proper and in accordance with the underlying loan documents and applicable law, and that the amounts included in the Forbearance Agreement and its Proof of Claim are as provided for in the underlying loan documents and applicable law.

---

[1]   This amount consists of the default interest plus interest, compound interest and late fees.

After the Forbearance Agreement was signed, Greg Hahn put the principal of the Debtor in touch with a Jim Jay, purportedly from Chatham Investments, to refinance the indebtedness with Equitable.   After much discussion, Mr. Jay suggested that the Debtor file bankruptcy reorganization to be able to negotiate better with not only Equitable, but also the Internal Revenue Service.

A second result of the cash flow problems was that the Debtor fell behind on its payments to the Internal Revenue Service for payroll taxes.   When the Debtor was unable to reach a payout agreement with the Internal Revenue Service and Equitable, it filed under Chapter 11 to gain a reprieve from collection activities, to stop the threat of foreclosure on its steel plant and underlying real property, allow it to peacefully reorganize, and to formulate a plan for paying its indebtedness over a five year period.

C.       **Operation and Present Condition.**

Since the filing of Chapter 11, Ford Steel has taken the opportunity to "reorganize" in every sense of the word. There has been a completed restructuring of the way the financial planning and budgeting is conducted. Budget meetings are held three times a week to review and plan each step taken by both companies throughout the week to ensure that all needs are met and that money is allocated properly before it is even received. This has enabled Ford Steel to operate without additional financing working completely off of receivables. Another item that is worth noting is that the customer contracts have changed. Although each customer has individualized terms and conditions, the influx of new customers has enabled Ford Steel to negotiate better deals, the largest being material deposits. In the past Ford Steel had to "float" almost 100% of the customer's jobs meaning if that job lasted 3 months and had significant material, then Ford Steel was not seeing a

return for labor, material or anything else for at least 30 days after total job completion. The fact that deposits are negotiated more frequently now only ensures that there is less cost that must be balanced with each job, and more jobs are able to be taken and pursued.

Another large factor is the certifications that Ford Steel now holds. Unfortunately, the API and ISO certifications were official several months after last oil crash, however Ford Steel has maintained and improved the ISO 2001:2015, API 4F and API Q1 as well as AISC licenses throughout the downturn, placing it far above the competition in the current rebound. These quality certifications not only mark superior quality work and structure, they also allow Ford Steel to be able to perform certain processes that only certified fabricators can perform. Major companies must require the certifications for critical work (such as welding) to ensure the safety of products made. There are many certificate holders in the Houston area but only a few fabricators- (most are engineers) placing Ford Steel in front of the competition as many companies are required to use API and ISO certified fabricators.

Ford Steel will of course also be receiving the benefit of all modification and structural steel required by HC Jeffries Tower Company throughout the repack as they are the sole fabricator of towers for the company.    Ford Steel leases a portion of its office and shop space to HC Jeffries Tower Company for $5,000.00 per month.   The lease and the rental rate are required under the financing with Equitable.

The Debtor currently employs approximately 40 shop workers and six administrative personnel.   These employees consist of:

    a.   12 welders at $18 - 28.00 /hour;

    b.   14 fitters/helpers at $13 - 28.00/hour;

    c.  5 machine operators/programmers at $14 - 23.00/hour;

    d.  2 supervisors at $29 - 33.00/hour;

    e.  1 QA/QC Manger at $39.00/hour;

    f.  3 shipping clerks at $12 - 30.00/hour;

    g.  2 maintenance personnel at $18 - 20.00/hour;

    h.  1 janitor at $18.00/hour;

    i.  1 detailer at $61,300.00 per year;

    j.  1 estimator at $100,000.00 per year;

    k.  1 salesperson straight commission, the percentage of which depends upon the sale but he averages $122,500.00 a year;

    l.  1 security person at $23.00/hour;

    m.  2 administrative personnel at $27 - 48.00/hour, and,

    n.  Mary Jeffries as manager, at an annual salary of $156,000.00[2].

The Debtor shall continue with these employees throughout the pendency of the Chapter 11 Plan with no salary increases[3].

It is important to note that during the pendency of the Chapter 11 proceeding, the Debtor has continued operations using only its cash flow without the need for debtor-in-possession financing.   This is important in that the Debtor, with only the relief from filing the Chapter 11, has been able to reorganize its indebtedness without incurring any new secured and/or priority debt.   Throughout the pendency of the Chapter 11, the Debtor has been able to collect on its

---

[2]  The President of the Debtor, Herbert Jeffries, does not take a salary from this entity.
[3]  However, as business increases, the Debtor reserves the right to hire additional employees at the same salary level(s) as disclosed herein.

outstanding and newly created accounts receivable, without challenge, and use the funds to fund its operations.

**Indebtedness on the filing date:**

As of the date of filing, the Debtor's indebtedness was as follows:

| | | |
|---|---|---:|
| 1. | Secured Debt: | $7,663,863.87 |
| 2. | Priority Debt: | $325,233.88 |
| 3. | Undisputed Unsecured Debt: | $4,950,106.04[4] |
| | **Total:** | **$12,939,203.79** |

## V.
## Anticipated Future of the Debtor

**A.     Liquidation Analysis:**        The Debtor has compiled a "Liquidation Analysis" to predict the outcome and payment to its creditors if the Debtor were to be liquidated under Chapter 7 of Title 11 of the United States Code.   A true and correct copy of the "Liquidation Analysis" is attached hereto as Exhibit "A" and incorporated herein by reference.

The Debtor has also prepared annual Cash Flow Projections for the next five years setting forth estimated revenue, operating expenses and payments to the classes under the proposed Plan. These estimates are based on historical figures, current contracts and predicted profits of the Debtor's business.    The Cash Flow Projection is attached as Exhibit "B".

---

[4]   This total has been adjusted post-petition as the books and records were reconciled.    It does not include the unsecured debt owed to HJ Tower Management, Inc. or Sagebrush Towers, Inc. in the amounts of $16,645/70   and $124,935.53 respectively, as these companies are also owned by the Principal of the Debtor.    These companies, although owned by the same Principal as the Debtor, are not affiliated with the Debtor and their operations will neither impact the feasibility nor have any outcome on the success of the Debtor's plan.

The Debtor has determined that it is in its best interest and that of its creditors to sell its real property with improvements (the "Property") and lease the Property from the new owners.  This will allow it to pay the secured creditors, Equitable Life and Casualty Insurance Company ("Equitable") and Bank & Trust of Bryan/College Station ("Bank") in full, Montgomery County for the ad valorem taxes in full, and pay approximately 2,300,000 towards the secured claim of the Internal Revenue Service.    The Debtor believes it can sell the Property within six months to one year for at least $5,500,000.00 as it appraises for almost 8,000,000.00.    All net proceeds from the sale in excess of the amount necessary to pay closing costs, Equitable, Bank and Montgomery County will be paid to the secured claim of the Internal Revenue Service ("IRS").    The Debtor is interviewing brokers, including Bill Ginder, a Senior Vice President of Brokerage Services at the Caldwell Companies to market the property.    Once a decision is made on a broker, Debtor will file an application with the Court for permission to hire the brokerage company.    If the Debtor is not able to lease the Property from the new owners, it shall lease other Property around Porter, Texas.   The lease of Property is anticipated to be $50,000 per month, based upon the rental rates of comparable properties in Porter and the surrounding area.

If the Property fails to sell or be refinanced within one year from the date of confirmation, the Plan Injunction shall lift to allow Equitable, Bank, Montgomery County, and/or the Internal Revenue Service to foreclose on the Property in accordance with the laws of the State of Texas without further Order of the Court.   If such a foreclosure occurs, the Debtor's personal property will remain property of the newly reorganized Debtor subject to Bank's first lien position.

If the Debtor is unable to sell the Property, it  Debtor reserves the right to refinance the Property in order to pay Equitable, Bank and Montgomery County in full with the remainder being

paid to the IRS in partial or full satisfaction of its secured claim.   If the Debtor chooses to refinance the Property, it will be in its best interest to refinance at the highest possible amount to reduce the indebtedness to the fourth lienholder, the IRS.

The Debtor shall be responsible for escrowing and paying any real property taxes that become due while the Debtor owns the property.

**B.     Absolute Priority Rule:**     The "absolute priority rule" is the rule that states that the holder of any claim or interest that is junior to the claims of an impaired unsecured class of creditors will not receive or retain under the plan on account of their junior claim or interest any property (in this case, the stock in the Debtor) unless all senior claims are paid in full.     Pursuant to the liquidation analysis, the unsecured creditors would receive nothing if this bankruptcy proceeding was converted to a Chapter 7 proceeding, but in this Chapter 11 proceeding, they will be receiving 100% of their claims.   Therefore the absolute priority rule does not apply in this proceeding.

## VI.
## Source of Information for this Disclosure Statement

The information contained herein has not been subject to a certified audit.   Much of the information, descriptions, values and facts contained herein are derived from the Debtor's principal's experience in the tall tower business, and the unverified opinions of third parties. Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.   This Disclosure Statement contains, in summary, the Plan itself which is controlling in the event of any inconsistencies.   Each creditor is urged to review the Plan prior to voting.

The statements contained in this Disclosure Statement are made as of the date hereof unless

Disclosure Statement - Ford Steel, LLC

another time is specified herein.   The delivery of this Disclosure Statement shall not, under any circumstances, create an implication that there has not been any change in the facts as set forth herein since the date hereof.   All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

## VII.
## Disclaimer

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, PAST OR FUTURE BUSINESS OPERATIONS, OR THE PLAN ARE AUTHORIZED NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON   IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ACCURACY.   THE FACTUAL INFORMATION REGARDING THE DEBTOR, THE DEBTOR'S ESTATE, ITS ASSETS AND LIABILITIES HAS BEEN DERIVED FROM THE DEBTOR'S RECORDS, THE DEBTOR'S SCHEDULES, PUBLIC RECORDS AND RELATED DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**NEITHER THE DEBTOR NOR ITS COUNSEL CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ANY INACCURACY, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT A FINDING BY THE COURT THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE AND COMPLETE.   FURTHER, APPROVAL OF THE DISCLOSURE STATEMENT IS NOT AN INDICATION BY THE COURT OF THE CONFIRMABILITY OF THE PLAN.**

**THE ABILITY OF THE DEBTOR TO ACHIEVE ITS PROJECTIONS IS SUBJECT TO SUBSTANTIAL RISKS FROM SUCH FACTORS AS, BUT NOT LIMITED TO, THE STEEL MANUFACTURING BUSINESS, CONTRACTS RELATED THERETO AND THE ECONOMY; THEREFORE ANY PROJECTIONS PREPARED BY THE**

Disclosure Statement - Ford Steel, LLC

**DEBTOR DO NOT CONSTITUTE GUARANTIES OF RESULTS.**

**VIII.**
**Professional Fees**

The Debtor engaged the law firm of Cooper & Scully, Julie M. Koenig as Lead Counsel, to represent the Debtor in this Chapter 11 proceeding.   The Court entered an Order approving retention of the law firm on September 11, 2017, at Docket No. 14.      Cooper & Scully received an initial retainer in the amount of $25,000.00 plus the filing fee of $1,107.00.      Pre-petition Cooper & Scully withdrew the sum of $1,260.58 for work performed to file the case leaving a retainer of $23,739.42.

**IX.**
**Description of Assets and Value**

A complete listing of all assets is set forth in the Bankruptcy Schedules and Statement of Financial Affairs on file with the United States Bankruptcy Court for the Southern District of Texas, Houston Division.      According to these Schedules the Debtor has assets valued at $9,897,951.02.   In August of 2016, the WFA Group performed an appraisal of the Debtor's machinery and equipment.   The value of the Debtor's machinery and equipment on its Schedules is the fair market value from that appraisal.   Also in August of 2016 Gary Brown & Associates performed an appraisal on the Debtor's real property.   The value of the Debtor's real property on its Schedules is the fair market value from that appraisal.   A complete listing of the Debtor's assets are set forth on Schedule B filed at Docket No. 20, in Case No. 17-35028-H5-11.

**X.**
**Summary of the Plan**

The following is a brief summary of certain provisions of the proposed Plan of

Reorganization to assure that the creditors affected understand its provisions.   This summary should not be considered as solicitation for acceptance of that Plan.   Additionally, creditors should not rely on this summary to decide whether or not to vote in favor of or against the Plan, but are expressly referred to the Plan itself since it contains many provisions which will not be summarized herein.

The Plan of Reorganization proposes the continuation of the Debtor's business utilizing the profits to fund the plan over a 5 to 10 year period.   However, the Debtor reserves the right to pre-pay any class on a pro-rata basis as funds are available over the life of the Plan.

The Debtor's Plan of Reorganization will provide for classification of creditors in accordance with the United States Bankruptcy Code.   The Debtor is in the steel fabrication business, a type of construction business.   It is customary in the construction business for a slow-down in business during the holiday period October through December.    This often results in lower revenues during the first three months of the year.   Due to the slow-down during the holiday period,   the Debtor reserves the right, in the event it is unable to make the full quarterly or monthly payment to any Class of Creditors in any given year, due to an act of nature such as Hurricane Harvey, to pay the unpaid amount during the remaining three quarters of that year.   The unpaid amount will include interest at the contract, not default, rate if such interest is a provision of an underlying contract between the Debtor and the creditor.    The unpaid amount may be paid in any manner whether it is monthly or in a lump sum provided that it is paid in full within eleven months from the missed payment.   Such a delay in payment shall not constitute a default under the Plan of Reorganization.

     **A.**     <u>**Classes under the Plan**</u>

Disclosure Statement - Ford Steel, LLC

**Class 1- Administrative Expenses - Legal Fees**.  Class 1 is unimpaired.  Class 1 are administrative claims entitled to priority by Section 507(a)(2) of the Bankruptcy Code and will consist of fees and expenses incurred by the Court appointed Counsel and North American Galvanizing Company, LLC., d/b/a AZZ Galvanizing - Houston West ("AZZ Galvanizing"). These fees and claims are incurred prior to the effective date of the Plan, as the same are finally approved and allowed by final order of the Court, and any other expenses incurred during the course of the Chapter 11 proceeding that have not yet been paid.   The members of this class are Cooper & Scully, PC, Counsel for the Debtor and AZZ Galvanizing

All claims in this class shall be paid in cash and in full in such amounts as may be allowed and approved by the Court on the effective date or after such claims are finally allowed, whichever is later, by the Debtor to the extent of available funds, or such claims may be paid in accordance with any agreement or waiver.   In either event, claims in this class shall be paid in full within the one (1) year period of the initial plan.   The anticipated total expenses to be paid in this class to Counsel should not exceed $75,000 to $100,000.00.

AZZ Galvanizing shall be paid the sum of $35,106.47 on the effective date of the Plan.

**Class 2 - The United States Trustee**.   Class 2 is unimpaired and consists of the post-confirmation claim of the office of the United States Trustee for its fees from the date of confirmation until the Chapter 11 file is closed by the Bankruptcy Clerk.   These fees are based on the amount of disbursements made by the Debtor and are paid on a quarterly basis.    The reorganized Debtor shall be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6).    Any fees due as of the date of confirmation of the plan will be paid in full on the effective date of the plan.    After confirmation, the reorganized

Debtor shall pay United States Trustee quarterly fees as they accrue until this case is closed by the Court.     The Debtor shall file with the Court and serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.

All pre-confirmation quarterly fees shall be paid by the effective date of the Plan.

**Class 3A - Priority Claim of the Internal Revenue Service.**     Class 3A is impaired and consists of the priority claim of the Internal Revenue Service in the amount of $316,942.58.   This claim will be paid in equal monthly installments of $6,468.22 over a five year period[5].     The first payment shall be made on the 15th day of the first full month of the first full quarter following the effective date of the plan and continue until paid in full.

If the reorganized debtor substantially defaults on the plan payments due to the IRS, the outstanding balance is immediately due and payable.    Payments shall be for the entire amount owed to the IRS under the plan.   The IRS may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.

**Class 3B - Priority Claim of the Texas Comptroller of Public Accounts**.     Class 3B is impaired and consists of the priority claim of the Texas Comptroller of Public Accounts in the total amount of $1,904.58.   This claim shall be paid in full on the fifteenth day of the first full month of the first full quarter following the effective date of the Plan.

**Class 4A - Secured Claim of the Texas Workforce Commission**.   Class 4A is impaired and consists of the secured claim of the Texas Workforce Commission in the total amount of $8,196.82 with interest at the rate of 6%.   This claim will be paid in equal quarterly installments of

---

[5]   The five year period begins on the filing date although the payments do not begin until after the effective date.   This payment amount is presuming payments begin in July of 2018. If the actual payments begin after July of 2018, the amount of the payments will be adjusted upwards to ensure that all payments in this Class are made within 5 years of the filing date.

Disclosure Statement - Ford Steel, LLC

$2,137.46 over a one year period.    Upon confirmation, Counsel for the Texas Workforce Commission shall calculate and inform the Debtor of the exact amount of the payments.    The first payment shall be made on the 15th day of the third full month of the first full quarter following the effective date of the plan and continue until paid in full.

**Class 4B - Secured Claim of Montgomery County**.    Class 4B is impaired and consists of the secured claim of Montgomery County in the amount of $85,795.20 plus interest at the rate of 12%.    This claim will be paid in equal quarterly installments of $10,697.63 until the Property is sold or refinanced.    The first payment shall be made on the 15th day of the third full month of the first full quarter following the effective date of the plan and continue until the Property is sold, anticipated to be in six to twelve months.

Upon the sale or refinance, Counsel for Montgomery County shall calculate and inform the Debtor of the exact amount of the payoff.

If the Property fails to sell or be refinanced within one year from the date of confirmation, the Plan Injunction shall lift to allow Equitable, Bank, Montgomery County, and/or the Internal Revenue Service to foreclose on the Property in accordance with the laws of the State of Texas without further order of the Bankruptcy Court.

The claimant in this class shall retain all statutory liens on the Debtor's property. Post-petition secured ad valorem taxes will be paid in the ordinary course of business and failure to do so shall result in a default under the terms of the confirmed Plan.

Default of the Plan shall be defined as the failure of the proponent of the plan to make payments or perform any action required to be made under the terms of the confirmed plan.

In the event of a default, there will be full reinstatement of the administrative collection

powers and rights of this ad valorem Taxing Authority as they existed prior to the filing of the bankruptcy petition in this case, including, but not limited to, the assessment of taxes, the filing of Notices of Tax Liens and the powers of levy, seizure and sale.

### Class 4C - Secured Claim of the Bank & Trust of Bryan/College Station.

Class 4C is impaired. It consists of the secured claim of The Bank & Trust of Bryan/College Station (the "Bank") in the amount of $678,078.16 with interest at the rate of 8% over ten (10) years.

The Bank retains a blanket first lien on all of Debtor's personal property. Such personal property consists of all Debtor's fixtures, furniture, equipment, inventory, accounts, chattel paper, general intangibles, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind related to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles, and other account proceeds). The Bank also holds a second lien on Debtor's real estate with improvements. The Bank's claim is also secured by a blanket first lien on the jointly-administered Debtor H.C. Jeffries Tower Company, Inc.'s furniture, fixtures, equipment, inventory, accounts, chattel paper, general intangibles, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind related to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles, and other account proceeds). The Bank's claim shall be paid solely through this Debtor's Plan. However, should this Debtor default in payments to the Bank under the Plan, the Plan injunction under this Debtor's Plan and the Plan injunction under the joint-administered Debtor's plan of reorganization shall lift to

allow the Bank to foreclose on its collateral owned by this Debtor and/or the jointly-administered Debtor under applicable state law.

The Bank has received monthly payments in the amount of $10,000 by the 25th day of each month during the pendency of this case from this Debtor. The Bank shall continue to receive payment in the amount of $10,000 through the Effective Date of the Plan from this Debtor. On the fifteenth day of the first full month following the Effective Date of the Plan, the Reorganized Debtor shall begin making payments to the Bank in accordance with the loan documents in the amount of $8,270.44 for a period of ten (10) years or until the Debtor's real property upon which the Bank retains a second lien is sold or refinanced at which time the Bank's claim will be paid in full and the Bank's liens against the Debtor's property shall be released. The Bank shall retain its first lien on the Debtor's personal property, its second lien on the Debtor's real property, and its first lien on the jointly-administered debtor's personal property until the Bank's claim is paid in full.

If the Debtor's real property fails to sell or be refinanced in accordance with the Plan within one year from the date of confirmation, the Plan's injunction shall lift to allow Equitable, the Bank, Montgomery County, and/or the Internal Revenue Service to foreclose on the Debtor's real property in accordance with the laws of the State of Texas.

Until such time as the Bank's claim is paid in full, the Debtor shall provide the Bank, through its counsel, with monthly operating reports in the same form promulgated by the United States Trustee with proof of payments under its confirmed plan. Furthermore, by the tenth day of each month, the Debtor shall provide the Bank, through its counsel, with monthly balance sheets, income statements, cash flow statements, and reports of the Debtor's Accounts Receivable as of the last day of the preceding month until such time as the Bank's claim is paid in full. Such Accounts

Receivable reports shall contain the entity owing money to the Debtor, the amount each entity owes the Debtor, and contact information including telephone number and mailing address of each entity.

**Class 4D - Secured Claim of The Internal Revenue Service**.   Class 4D is impaired and consists of the secured claim of the Internal Revenue Service ("IRS") amount of $4,297,205.09 with interest at the rate of 5%.    This claim is secured and perfected by the Debtor's real and personal property through IRS tax lien filings in the real property records of Montgomery County, Texas, and filed with the Texas Secretary of State.

This claim will be paid in monthly installments as follows:

a.  $70,000.00 per month over the first eleven months or until the Property is sold or refinanced;

b.  Approximately $2,268,705.00 from the sale of the property - the IRS shall receive all proceeds from the sale or refinance after closing costs and payment in full of Equitable, Bank, and Montgomery County;

c.  $43,722.54 per month for the remaining thirty -six months until paid in full.   The claim of the IRS shall be paid in full within five years from the date the bankruptcy case was filed.

d.  The Debtor shall provide the IRS, through its Counsel, with monthly operating reports in the same form as promulgated by the United States Trustee with proof of payments under its confirmed plan until the real property is sold or refinanced.

The first payment shall be made on the 15th day of the first full month of the first full quarter following the effective date of the plan and continue until paid in full, a time not to exceed five years from the date the bankruptcy case was filed.

If the Property fails to sell or be refinanced within one year from the date of confirmation, the Plan Injunction shall lift to allow Equitable, Bank, Montgomery County, and/or the Internal Revenue Service to foreclose on the Property and the payments in this class will be adjusted accordingly to insure compliance with 11 U.S.C. §1129(a)(9)(C).   Any foreclosure on the Property will be in accordance with the laws of the State of Texas and without the necessity of further orders of the Bankruptcy Court.

If the reorganized debtor substantially defaults on the plan payments due to the IRS, the outstanding balance is immediately due and payable.    Payments shall be for the entire amount owed to the IRS under the plan.   The IRS may collect these unpaid tax liabilities through the administrative collection provisions of the Internal Revenue Code.

**Class 4E - Secured Claim of Equitable Life and Casualty Insurance Company**.    Class 4E is impaired and consists of the secured claim of Equitable Life and Casualty Insurance Company ("Equitable") in the amount of $2,664,169.12[6].    This claim is secured by a mortgage lien on the Debtor's real property with improvements (the "Property").

This claim shall be paid in equal monthly payments of $24,306.81 with interest at the rate of 7.5% per annum until it becomes due and payable in full upon the earlier of (i) a sale or refinance of the Property that results in the irrevocable payment in full of the Class 4E Allowed Secured Claim, or (ii) 12 months after the Effective Date of the Plan. During the pendency of the Chapter 11 proceeding, Equitable has received monthly payments in the amount of $28,000.00 by the 25th day of each month.   Equitable shall continue to receive the monthly payment in the amount of $28,000.00 through the Effective Date of the Plan.

---

[6]  This amount is still being negotiated.

On the fifteenth day of the first full month following the Effective Date of the Plan, the Reorganized Debtor shall begin making monthly payments to Equitable in the amount of $24,306.81. These payments shall continue monthly until the earlier of (i) a sale or refinance of the Property that results in the irrevocable payment in full of the Class 4E Allowed Secured Claim, or (ii) 12 months after the Effective Date of the Plan.

Equitable shall be irrevocably paid in full from any sale or refinance of the Property.  Equitable's Liens against the Property shall be released only upon the irrevocable payment in full of the Class 4E Allowed Secured Claim.  Equitable shall retain its Liens on the Property until its Class 4E Allowed Secured Claim is paid in full.

Notwithstanding anything to the contrary in the Plan or anywhere else, if (a) the Debtor or Reorganized Debtor fails to make any monthly payment to Equitable provided for above after fourteen days notice of such failure is provided to the Debtor or Reorganized Debtor and its counsel of record sent via messenger or overnight delivery with delivery completed (and the notice clock started) when it is delivered during normal business hours to the Debtor or Reorganized Debtor and its counsel. If no one is there (or if no one agrees to accept delivery) during normal business hours, then leaving the notice there during normal business hours would constitute completion of delivery, or (b) the Property fails to sell or be refinanced (resulting in the irrevocable payment in full of the Class 4E Allowed Secured Claim) within one year from the date of confirmation, then the Plan Injunction shall automatically lift at such time to allow Equitable, Bank, Montgomery County, and/or the Internal Revenue Service to prepare for and foreclose on the Property in accordance with the laws of the State of Texas ("Foreclosure Rights").

Disclosure Statement - Ford Steel, LLC

The Debtor shall provide Equitable, through its Counsel, with monthly operating reports in the same form as promulgated by the United States Trustee with proof of payments under its confirmed plan until the Property is sold or refinanced and the Class 4E Allowed Secured Claim is paid in full.

**Class 5 - General Unsecured Claims.**     Class 5 is impaired and consists of the unsecured claims in the amount of $1,529,283.93, excluding insider claims.     These claims shall be paid 100% of their claims in equal quarterly installments over a 5 year period.     The first payment shall be made on the 15th day of the third full month of the first full quarter following the effective date of the plan.     The anticipated quarterly installment to these creditors is as follows:

    a.   $50,000.00 over the first year;

    b.   $60,000.00 over the second year;

    c.   $75,000.00 over the third year;

    d.   $75,000.00 over the fourth year; and,

    e.   $122,321.00 over the fifth year.

**Class 6 - Insider Steve Bales.**     Class 6 is impaired and consists of the insider unsecured claims of Steve Bales in the total amount of $3,420,822.11.     Steve Bales is a private investor and minority shareholder of the Debtor.   He initially factored receivables for the Debtor and those that went unpaid were converted to a note.   These claims will be paid in equal monthly installments of $57,013.70 over a five year period.  **However, payment on these claims shall not begin until the fifteenth day of the first full month of the first full quarter following completion of all payment to Class 5, supra**.     It is anticipated that these claims shall be paid in months 61 - 120 of

the Plan.

**Class 7 - Equity Security Holders.**    Class 7 is impaired and consists of the equity security holders of the Debtor, Herbert Jeffries and Steve Bales.    As the Debtor is paying 100% to the unsecured creditors, they will retain their respective interests in the Reorganized Debtor. Therefore, on the Effective Date, Herbert Jeffries shall receive 86% and Steve Bales shall receive 14% of the Reorganized Debtor.

**B.**    **Other Provisions**

Notwithstanding confirmation of the Plan, the Court will retain jurisdiction (i) to determine the allowance of claims upon objection by a party-in-interest; (ii) to determine requests for payment of administrative claims and expenses, including compensation, entitled to priority under §507(a)(i) of the Code; (iii) to resolve disputes regarding interpretation of the Plan; (iv) to modify the Plan; (v) to implement provisions of the Plan; (vi) to adjudicate any cause of action brought by the Debtor or Trustee as representatives of the estate; (vii) to enter a final decree; and (viii) for other purposes.

**C.**    **Bar dates for filing proofs of claim**

Any creditor desiring to receive a distribution under the provisions of this Plan, and whose claim is not evidenced by a court order or set forth on the Debtor's schedules, must have filed a proof of claim or request for compensation with the Bankruptcy Court **not later than January 24, 2018**.  The proof of claim deadline for governmental entities is April 2, 2018.

These bar dates are set by the Bankruptcy Court and noticed to all creditors pursuant to the Notice of Creditor's Meeting.

The Debtor has filed as a part of its schedules a list of all creditors, setting forth the identity of each creditor and an indication of the amount due each creditor.   Unless a claim is listed as

disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on the Debtor's schedules.   Any creditor who disputes the amount listed on the Debtor's schedules must have filed a proof of claim in a different amount or status not later than January 24, 2018, or not later than April 2, 2018, for governmental entities.   Failure to have filed a timely proof of claim will force a creditor to accept the amount of his/her claim as listed on the Debtor's schedules.

Claims listed as **disputed, contingent, or unliquidated** will not be allowed unless a proof of claim with all supporting documents was filed prior to January 24, 2018, or prior to April 2, 2018, for governmental entities.   In the event a creditor has filed a proof of claim in these proceedings with which the Debtor disagrees, the Debtor has the option to file an objection to that claim and request the Court to determine the true value of the claim.   The Debtor shall attempt to resolve all objections to claims prior to confirmation.   However, the Debtor shall have 60 days from the effective date of the plan to file objections to claims.

Any claim for a debt listed on the Debtor's Schedules as **disputed, contingent, or unliquidated** for which a proof of claim is not timely filed shall be of **no force and effect**.   No distribution will be made to any creditor that has not timely complied with this provision.

## XI.
## Pending Litigation

There is one pending lawsuit against the Debtor, which has been stayed pursuant to 11 U.S.C. §362(a) and the automatic stay has not been lifted on that proceeding.   The lawsuit is styled *The Bank & Trust of Bryan/College Station vs. HC Jeffries Tower Company, Ford Steel, LLC and Herbert Jeffries*, Cause No. 17-001700-CV-85 in the 85th District Court of Brazos County, Texas.

The Plaintiff in this case shall be bound by the Debtor's Plan of Reorganization and shall take nothing against any third part defendants provided that the Debtor is paying its creditors, including the Bank, under its confirmed plan.    In the event of default under this Plan, Plaintiff is not bound by this Plan of Reorganization.

**XII.**
**Alternatives to the Plan Proposed**

The Debtor expects that the Plan will enable it to realize the maximum benefits for all of its creditors.  However, if the Plan is not confirmed, the Debtor will continue to seek other avenues for reorganization.

**A.     Conversion**

In the event no suitable alternative can be found, the Debtor would be compelled, as well as obligated, to recommend the conversion of the Chapter 11 case to a case under Chapter 7, and a subsequent liquidation by a duly appointed or elected Chapter 7 trustee.  The plan provides that property of the estate will vest in the reorganized Debtor thirty days after entry of the final confirmation order.  Creditors shall retain their ability to utilize rights under 11 U.S.C. § 1112(b)(8) to request conversion.  Upon a conversion of this case to Chapter 7, all property re-vested in the Debtor under the Plan, or subsequently acquired, shall constitute property of the bankruptcy estate in the converted case.   Although the Debtor is of the opinion that a straight liquidation of the assets would not be in the best interest of the creditors generally, the following is likely to occur:

(i)     The newly appointed Chapter 7 trustee would have to become familiar with the Debtor's operations in order to evaluate all the Debtor's assets and liabilities;

(ii)     In addition to the duplication of efforts that would transpire as a result of the

Chapter 7 Trustee having to review documents and interview persons in order to become sufficiently acquainted with the Debtor's business, the Chapter 7 Trustee would likely retain professionals to aid in administering the estate;

(iii)    An additional tier of administrative expenses entitled to priority over general unsecured claims would be incurred.   Such administrative expenses would include Chapter 7 Trustee's commissions and fees for the professionals likely to be retained; and

(iv)    There would likely be no distribution at all to the creditors until the case is ready to be closed in approximately two (2) more years.

The Debtor will allow the creditors and parties-in-interest to draw their own conclusions with respect to the delay associated with a Chapter 7 liquidation.   It is certain that the above factors would result in an additional dilution to the projected dividend.   The Debtor believes that such a speculative projection should be made by the creditors themselves.

The Debtor believes if the assets of the Debtor were liquidated through a court trustee the payments to creditors would be less than provided in this Plan.

**B.    Dismissal**

Dismissal of the proceeding would, in the Debtor's opinion, lead to an unsatisfactory result.

The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor.   The vote on the Plan does not include a vote on alternatives to the Plan.   There is no assurance what turn the proceedings will take if the Plan is rejected.   If you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should consult your counsel.

The economy is the only risk posed to creditors that would result in an amendment or change in the plan.

Disclosure Statement - Ford Steel, LLC

C.    **Default**

Upon confirmation of a Chapter 11 Plan, the Plan operates as a contract between the Debtor and its creditors.   A default occurs if the Debtor fails to make any required payments contained in the Plan.   Each creditor, regardless of class, has the right upon a default under the plan to notify the Debtor and its Counsel of the default and allow 14 days for the Debtor to cure such default.   Notice of default must be made in writing to the Debtor and its Counsel and delivered  by messenger or overnight delivery service with delivery completed (and the notice clock started) when it is delivered during normal business hours to the Debtor or Reorganized Debtor and its counsel. If no one is there (or if no one agrees to accept delivery) during normal business hours, then leaving the notice there during normal business hours would constitute completion of delivery.    Notice of default shall be given to the following:

> Mr. Herbert C. Jeffries
> 24900 Ford Road
> Porter, Texas 77365
>          and
>
> Julie M. Koenig
> 815 Walker, Suite 1040
> Houston, Texas 77002

If the Debtor fails to cure the default within the 14 day period, the Creditor sending notice of default has the right to bring a lawsuit in the State District Court in Montgomery County, Texas against the Debtor or to apply to the Federal Bankruptcy Court for relief from the terms of the Plan.

**XIII.**
**Federal Income Tax Consequences to Creditors and the Debtor**

A.    **Federal Tax Consequences to Creditors**

The Debtor believes that the following discussion generally sets forth the Federal income

tax consequences to Creditors upon confirmation and consummation of the Plan. No ruling has been sought or obtained by the Debtor from the IRS with respect to any of these matters. The following discussion of Federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal income tax consequences to any Creditor.

**AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.**

Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor. The method of accounting utilized by a Creditor for Federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor distributee will be the difference between (i) the Creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

B.     **Federal Tax Consequences to the Debtor**

As the Debtor is considered insolvent within the 90 days prior to filing its Chapter 11 Proceeding, there will not be any tax consequences for "forgiveness of debt". There are no tax consequences to the Debtor as a result of its filing for Chapter 11 Reorganization nor will there be

any tax consequences as a result of completing its Plan of Reorganization.

## XIV.
## Means for Implementation and Execution of the Plan

Implementation of the Plan requires entry of an order by the Bankruptcy Court confirming the Plan.   The Plan is to be implemented, if accepted and approved by the Bankruptcy Court, in its entire form as filed on May 17, 2018.     The effective date of the plan shall be 30 days after the date the Plan is confirmed by this Court.

## XV.
## Modification of Disclosure

The Debtor may propose amendments to or modification of this Disclosure Statement at any time prior to the confirmation, with leave of the Court.   After confirmation, the proponent may, with the approval of the Court, so long as it does not materially or adversely affect the interests of the creditors or other parties-in-interest as set forth herein, remedy any defect or omission, reconcile any inconsistencies in this Disclosure Statement, or in the Order Confirming Disclosure Statement, in such a manner as may be necessary to carry out the purposes and intent of this Disclosure Statement.

## XVI.
## Disclosure Required by the Bankruptcy Code

The Bankruptcy Code requires the disclosure to the Bankruptcy Court of payments made or promised of the kind as set forth in Section 1129(a)(5) of the Bankruptcy Code.   The Debtor retained Julie M. Koenig, Cooper & Scully, PC, as bankruptcy counsel on a $25,000 retainer, of which $23,739.42 remained post-petition.   The Bankruptcy Code requires that the Court approve all professional's fee applications prior to payment by a Debtor.   Therefore all fees and costs

incurred are subject to approval of the Bankruptcy Judge.

## XVII.
## Fraudulent and Preferential Transfers

To the best of Debtor's knowledge and belief there have not been any fraudulent or preferential transfers within one year of the bankruptcy filing.

## XVIII.
## Other Bankruptcies

The Debtor has not filed a prior bankruptcy.

## XIX.
## Conclusion

The Debtor believes that approval of its Plan will provide an opportunity for its creditors to receive more money in the foreseeable future on their claims than would be received in a straight liquidation by a Trustee in a Chapter 7 case or from a distress sale of all the assets.   If the Plan is not approved, the Debtor will continue to seek other reorganization alternatives, but liquidation might ensue, with the consequences as discussed above in relation to the liquidation alternative.

This Disclosure Statement is subject to the approval by the Bankruptcy Court after notice and hearing.

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The Plan of Reorganization contains additional provisions and each creditor should review the provisions of the Plan with particularity.

Disclosure Statement - Ford Steel, LLC

Respectfully submitted this 7th day of June , 2018.

**Ford Steel, LLC.**

By:_____*/s/ Herbert C. Jeffries, Managing Member*___
       Herbert C. Jeffries, Managing Member

OF COUNSEL:

**COOPER & SCULLY, PC.**

By: */s/    Julie M. Koenig*_____
   Julie M. Koenig
   State Bar No. 14217300
   815 Walker, Suite 1040
   Houston, Texas 77002
   713/236-6800 (Telephone)
   713/236-6880 (Telecopier)
   Julie.Koenig@cooperscully.com

   Attorneys for the Debtor