IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** § | | |
| § | **Case No. 17-35027** | |
| **H.C. Jeffries Tower Company, Inc.,** § | | |
| § | **Chapter 11** | |
| **Debtor.** § | | |
| § | | |
| **In re:** § | | |
| § | | |
| § | **Case No. 17-35028** | |
| **Ford Steel, LLC,** § | | |
| § | **Chapter 11** | |
| **Debtor.** § | | |

**Objection by the United States of America to Plans of Reorganization Proposed by
<u>H.C. Jeffries Tower Company, Inc., and Ford Steel, LLC</u>
(Related to Doc. Nos. 114 and 116)**

**To the Honorable Eduardo V. Rodriguez,
United States Bankruptcy Judge:**

The United States of America (the "United States"), acting on behalf of its Internal Revenue Service (the "IRS"), objects to both plans of reorganization proposed by Ford Steel, LLC, and H.C. Jeffries Tower Company, Inc.

**<u>Summary</u>**

The Debtors' cannot meet their burden under 11 U.S.C. §§ 1123 and 1129 because, among other reasons, the plans are not feasible. The United States requests that the Court deny confirmation of both.

The Debtors' cases are being jointly administered, but they filed separate plans. This objection first sets forth the United States' objections to the plan of Ford Steel, LLC, then its objections to the plan of H.C. Jeffries Tower Company, Inc.

1

## Objection to Confirmation of Plan Proposed by Ford Steel, LLC

**Section 1129(a)(2) – Plan Does Not Comply with the Code**

The Ford Steel Plan does not comply with 11 U.S.C. § 503(b)(1)(D). Section 503(b)(1)(D) excuses governmental units from filing applications under § 503 for the allowance of administrative tax expenses. Instead of complying with this provision, the Ford Steel Plan [Doc. No. 116] requires all administrative claimants to file an application. [Doc. No. 116, pp. 6-7]. It is improper for the Ford Steel Plan to contravene § 503 and attempt to force the United States to file a § 503 application before receiving payment of taxes incurred after the Petition Date.

**Section 1129(a)(3) – Good Faith**

Ford Steel did not propose its Plan in good faith. "A plan is proposed in good faith only '[w]here [a] plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success.'" *In re Star Ambulance Service, LLC*, 540 B.R. 251, 262 (S.D. Tex. 2015) (quoting *In re Village at Camp Bowe I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013)). Courts should conduct the "good faith" inquiry "in light of the totality of the circumstances surrounding establishment of [the] plan." *Id.*

The Ford Steel proposes to sell or refinance its real property within one year of confirmation. [Doc. No. 116, p. 12]. However, Ford Steel has already enjoyed more than a year to do so, and it has not made any real progress toward doing so. First, Ford Steel has not even employed a real estate broker, indicating that it is not serious about selling the real property. Second, although Ford Steel has informed the United States that it has entered into negotiations to refinance, the proposed refinance would require the IRS to subordinate its lien to a high-interest loan—something the IRS is not willing to do.

Moreover, based on past history, it appears unlikely that Ford Steel can reorganize in a way that pays the IRS in accordance with 11 U.S.C. § 1129(a)(9) without selling the real property or obtaining significant new financing. Ford Steel has earned a total $1,047,719.03 in net income over thirteen months in this case, [Doc. No. 142] (most-recent monthly operating report). This equates to average monthly net income of $80,593.77. Even if Ford Steel paid 100% of this to the IRS and did not pay any of its other creditors, it would not be able to pay the amount required to be paid to the IRS under § 1129(a)(9) within five years of the Petition Date plus pay other creditors. Ford Steel does not have a reasonable hope of successfully reorganizing.

**Section 1129(a)(8) – Acceptance**

The Ford Steel Plan impairs the IRS, and the United States has not accepted it. Ford Steel cannot satisfy 11 U.S.C. § 1129(a)(8), and it cannot confirm its Plan without cramdown.

**Section 1129(a)(9) – Treatment of Pre-Petition Tax Claims**

The Ford Steel Plan does not treat the IRS's pre-petition claim in accordance with § 1129(a)(9).

Section 1129(a)(9) requires that payments on account of priority tax claims be made (a) by "regular installment payments in cash," (b) "of a total value, as of the effective date . . . , equal to the allowed amount . . . ," and (c) within five years from the petition date. This applies to both (a) claims filed as priority unsecured and (b) secured claims which would be entitled to priority treatment but-for their secured status. 11 U.S.C. § 1129(a)(9)(D). Additionally, this provision means that Ford Steel must pay both the principal amount of the priority claim *and* post-petition interest. *In re Moore*, 25 B.R. 131 (Bankr. N.D. Tex. 1982); 11 U.S.C. § 511(b) (interest rate for the month when a plan is confirmed applies); https://www.irs.gov/newsroom/interest-rates-

remain-the-same-for-the-fourth-quarter-of-2018 (interest rate for tax claims is 5% during the fourth quarter of 2018).

Ford Steel filed bankruptcy on August 21, 2017. The IRS filed a proof of claim that includes (a) a secured portion in the amount of $4,297,205.09, and (b) a priority unsecured portion in the amount of $281,071.23. [Claim No. 4-2, Case No. 17-35028]. Of the secured portion, $4,284,134.47 arises due to FUTA and FICA liabilities and would be entitled to priority treatment but for its secured status. This leaves a total of $4,565,205.70 that Ford Steel must pay in full—plus 5% interest—on or before August 21, 2022.[1] The Ford Steel Plan does not do this.

However, paying the required amount plus interest by August 21, 2022, is not enough—the plan must provide for "regular installment payments in cash." *See In re Star Ambulance Service, LLC*, 540 B.R. 251, 265-66 (Bankr. S.D. Tex. 2015) (concluding that plan failed to satisfy § 1129(a)(9) when it did not set forth regular installment payments in cash). Ford Steel's plan does not satisfy this because it purports to reserve the "right" for Ford Steel to withhold payments if it is unable to make them. [Doc. No. 116, p. 6]. Although it is conditioned on the occurrence of "an act of nature," that makes the payments potentially irregular.[2]

**Section 1129(a)(11) – Likely to be Followed by Liquidation or Further Reorganization**

Ford Steel cannot show that confirmation is not likely to be followed by liquidation or the need for further reorganization.

Section 1129(a)(11) provides that the Court should only confirm Ford Steel's plan if "confirmation . . . is not likely to be followed by the liquidation, or the need for further financial

---

[1] The United States calculates that, if Ford Steel were to make regular monthly payments beginning in November 2018, Ford Steel would have to pay $111,467.49 per month to the IRS—something it does not have the cash flow to do.
[2] This provision references Hurricane Harvey, but it is broadly worded. If a snow storm delays work on a project for a week, does that count? What about a windy day? It leaves Ford Steel with too much leeway to unilaterally claim "act of nature."

reorganization, of the debtor . . . ." Feasibility does not require "a guarantee of success," but it does require "a reasonable assurance of commercial viability." *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1165-66 (5th Cir. 1993) (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)). Neither "terminal euphoria" nor "visionary schemes" qualify. *See In re Atrium High Point Ltd. Partnership*, 189 B.R. 599, 608-09 (Bankr. N.D. Cal. 1995) (declining to find that plan was feasible).[3] Ford Steel has the burden to show that its plan is feasible by a preponderance of the evidence. *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 215-16 (Bankr. W.D. Tex. 2008).

Ford Steel's plan is not feasible because, based on income generated during this case, it cannot afford the plan payments it has proposed. Ford Steel has not employed a broker to sell its real property, and it does not have refinancing secured. If Ford Steel sells the real property, there is no indication that Ford Steel has a new location lined up where it will be able to continue operations. Ford Steel's plan is not feasible.

**Section 1129(b) – Not Fair and Equitable**

Ford Steel may only confirm its plan under cramdown if it proves that its plan "does not discriminate unfairly, and is fair and equitable . . . ." 11 U.S.C. § 1129(b).

As to secured creditors, § 1129(b) requires that they retain the lien securing their claim. Although Ford Steel is proposing to allow some creditors to retain their liens, *e.g.* [Doc. No. 116, pp. 9 & 10], Ford Steel's plan says nothing about the IRS retaining its lien. In order to satisfy § 1129(b)(2)(A), Ford Steel must amend its plan to make clear that the IRS is retaining its lien encumbering Ford Steel's assets.

---

[3] The Fifth Circuit used the phrase "terminal euphoria" in *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting *Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985)).

Moreover, § 1129 provides that, before junior interest holders receive anything under the plan, unsecured creditors must receive "value, as of the effective date of the plan, equal to the allowed amount of [their] claim." 11 U.S.C. § 1129(b)(2)(B). This means that pre-petition equity interest holders cannot retain their equity unless they pay unsecured creditors in full *plus interest*. *In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 654 (9th Cir. 1997) (plan violated absolute priority rule where equity retained interests and unsecured claims were not paid post-petition interest) (citing *In re Perez*, 30 F.3d 1209, 1214-15 (9th Cir. 1994)) (cited in *In re Seasons Apartments, Ltd. Partnership*, 215 B.R. 953, 959-60 (Bankr. W.D. La. 1997); *see In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010) (claim impaired where not paid post-petition interest).

Ford Steel proposes to allow equity holders to retain their equity without doing either. Although Ford Steel proposes that Herbert Jeffries and Steve Bales retain their current equity, (a) neither is paying "new value," and (b) Ford Steel is not proposing to pay interest to unsecured creditors. [Doc. No. 116, p. 15].

**Section 1123**

The Ford Steel plan also does not satisfy 11 U.S.C. § 1123 because it does not provide adequate means for its implementation. There are a number of ambiguous provisions that significantly increase the risk of future litigation over their meaning.

First, the definition of "Allowed Amount" potentially creates confusion. [Doc. No. 116, p. 2]. As written, it requires an order from the Court authorizing claim amounts—disregarding the process under § 502 whereby a claim us allowed unless and until a party objects. The term only appears once in the Ford Steel plan, [Doc. No. 116, p. 5, ¶ 19], where it is used to define "Pro Rata Share." "Pro Rata Share" does not appear anywhere in the plan after the definition section.

6

Although maybe this can be disregarded as superfluous, the United States objects now to avoid the risk that Ford Steel one day takes the position that its claim is not "allowed" because the United States did not obtain an order allowing it.

Second, the Ford Steel plan only allows the IRS to pursue non-bankruptcy remedies if Ford Steel "substantially defaults," but it does not say what "substantially" means. [Doc. No. 116, pp. 8 & 12]. Does a missed payment qualify? Does it require two missed payments? If Ford Steel is making commitments to its creditors under a plan and it fails to keep those commitments, it is in default of what it promised to do. If Ford Steel defaults and forces the IRS to pursue non-bankruptcy remedies, the United States should not be left at risk of being dragged into court to argue what "substantially" means.

Third, the Ford Steel plan only allows the IRS to pursue "administrative collection" remedies in the event of "substantial default." [Doc. No. 116, pp. 8 & 12]. Although this appears intended to permit the IRS to pursue all remedies under Title 26, it is not clear. The United States is concerned that Ford Steel may later argue that this language prevents the IRS from recording a lien or filing suit in United States District Court. The United States objects to this language now to avoid additional litigation later.

Fourth, the "effect of confirmation" section of the Ford Steel plan is objectionable. [Doc. No. 116, p. 19]. It purports to permanently enjoin creditors from "collecting any indebtedness . . . outside of the confirmed Plan . . . ," without regard to whether (a) the indebtedness was not discharged pursuant to 11 U.S.C. § 1141(d)(6), or (b) Ford Steel defaults under the plan. If Ford Steel is able to confirm a plan, it is entitled to a discharge under the Bankruptcy Code—not an injunction which goes beyond what § 1141 provides.

7

Fifth, the default section in the Ford Steel plan conflicts with earlier language purporting to govern defaults. [Doc. No. 116, pp. 19-20]. The section provides that any missed payment constitutes a "default"—without the earlier "substantial" limitation—and it gives creditors "the right" to give notice of default to Ford Steel and its counsel. The section does not say that creditors are required to give notice of default, but it does say that creditors can only file suit after providing notice. This conflicts with other provisions in the plan related to a default by Ford Steel to the IRS, leaving ambiguity as to whether the IRS is required to send notice in the event of a default.

Sixth, the Ford Steel plan says that the automatic stay will remain in effect "until consummation," but it does not define "consummation." [Doc. No. 116, p. 23]. This is another ambiguity that risks unnecessary future litigation, and the United States objects to it.

Finally, the Ford Steel plan provides that creditors' only remedy is to file suit in Texas state court in the event of default. [Doc. No. 116, p. 20]. Not only does this conflict with the provisions governing a default in payment to the IRS, the provision would go against 28 U.S.C. § 1331 by trying to force the United States to file suit in state court. The plan should be clear that, in the event of any default in payment to the IRS, the United States is permitted to pursue all of its remedies under Title 26.

**Objection to Confirmation of Plan Proposed by H.C. Jeffries Tower Company, Inc.**

**Section 1129(a)(2) – Plan Does Not Comply with the Code**

The H.C. Jeffries plan also does not comply with the Bankruptcy Code because it attempts to require all administrative claims to file an application, contrary to 11 U.S.C. § 503(b)(1)(D). [Doc. No. 114, p. 6]. This would force the United States to file an application for payment of post-petition tax liabilities, which is improper.

**Section 1129(a)(3) – Good Faith**

H.C. Jeffries did not propose its plan in good faith. "Good faith" requires a "reasonable hope of success," but H.C. Jeffries is not generating enough income to make the plan payments it proposes. *Star Ambulance Service, LLC*, 540 B.R. at 262.

**Section 1129(a)(8) – Acceptance**

The H.C. Jeffries Plan also impairs the IRS, and the United States has not accepted it. H.C. Jeffries cannot satisfy 11 U.S.C. § 1129(a)(8), and it cannot confirm its Plan without cramdown.

**Section 1129(a)(9) – Treatment of Pre-Petition Tax Claims**

Like the Ford Steel plan, the H.C. Jeffries plan also does not propose to treat the IRS in accordance with 11 U.S.C. § 1129(a)(9).

As discussed above, H.C. Jeffries must pay in full, plus interest, within five years of the petition date both (a) the entire portion of the IRS's claim which is filed as and entitled to priority treatment, and (b) the entire portion of the IRS's claim which is filed as secured but would be entitled to priority treatment but for the security interest. The IRS's proof of claim against H.C. Jeffries includes (a) an unsecured priority portion in the amount of $900,630.77, and (b) a secured portion in the amount of $777,929.16, all of which is based on unpaid FICA liabilities. H.C. Jeffries must pay a total of $1,678,559.93 plus 5% interest to the IRS in within five years of the petition date, but its Plan does not provide for this.

As also discussed above, the H.C. Jeffries plan must provide for "regular installment payments in cash." Like the Ford Steel plan, the H.C. Jeffries plan does not satisfy this because it purports to give H.C. Jeffries the unilateral ability to suspend payments. [Doc. No. 114, p. 6].

9

**Section 1129(a)(11) – Likely to be Followed by Liquidation or Further Reorganization**

The United States also objects to H.C. Jeffries's plan on the grounds of feasibility. H.C. Jeffries has the burden to prove that its plan is feasible, but it is not clear that H.C. Jeffries can do so.

Section 1129(a)(11) provides that the Court should only confirm H.C. Jeffries's plan if "confirmation . . . is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." Feasibility does not require "a guarantee of success," but it does require "a reasonable assurance of commercial viability." *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1165-66 (5th Cir. 1993) (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989)). Neither "terminal euphoria" nor "visionary schemes" qualify. *See In re Atrium High Point Ltd. Partnership*, 189 B.R. 599, 608-09 (Bankr. N.D. Cal. 1995) (declining to find that plan was feasible). H.C. Jeffries has the burden to show that its plan is feasible by a preponderance of the evidence. *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 215-16 (Bankr. W.D. Tex. 2008).

H.C. Jeffries has generated average net monthly income of $31,207.14 during this case. [Doc. No. 141] (most-recent monthly operating report) ($436,900.01 in total net income divided by 13 months). The United States calculates that H.C. Jeffries would have to pay $40,984.98 per month to the IRS to pay its claim in accordance with § 1129(a)(9), assuming H.C. Jeffries began payments in November, 2018. H.C. Jeffries is not generating enough net income to pay the IRS alone, much less its other creditors. Moreover, it is unclear whether H.C. Jeffries will be able to operate at all if Ford Steel cannot confirm its plan and the real property—owned by Ford Steel but used by both Debtors—is sold by a chapter 7 trustee.

**Section 1129(b) – Not Fair and Equitable**

H.C. Jeffries may only confirm a plan under cramdown if it satisfies 11 U.S.C. § 1129(b). This requires H.C. Jeffries to show that its plan is "fair and equitable."

As discussed above, "fair and equitable" means that (a) secured creditors must retain liens, and (b) the plan must comply with the "absolute priority rule" as to general unsecured creditors. Similar to the Ford Steel plan, the H.C. Jeffries plan fails as to the IRS's secured claim because it does not state that the IRS is retaining its lien against the assets of H.C. Jeffries, even though it says that other creditors are retaining their liens. [Doc. No. 114, pp. 8, 9, 10-11].

The H.C. Jeffries plan is also not fair and equitable as to unsecured creditors. The H.C. Jeffries plan proposes to allow Herbert Jeffries to retain 100% of his equity in H.C. Jeffries, even though H.C. Jeffries is not paying interest on unsecured claims.

**Section 1123**

The H.C. Jeffries plan also contains too many ambiguous provisions to provide adequate means for implementation and satisfy 11 U.S.C. § 1123.

First, unlike the Ford Steel plan, the H.C. Jeffries contains no general default provision governing what occurs in the event that H.C. Jeffries misses a payment under the plan. H.C. Jeffries's plan should contain some provision setting forth the process for a creditor to pursue its non-bankruptcy remedies. The absence of a provision increases the possibility that H.C. Jeffries and/or its creditors will have to come back to this Court for a determination of their rights.

Second, the definition of "Allowed Amount" potentially creates confusion. [Doc. No. 114, p. 2]. As written, it requires an order from the Court authorizing claim amounts—disregarding the process under § 502 whereby a claim us allowed unless and until a party objects. The term only appears once in the Ford Steel plan, [Doc. No. 114, p. 5, ¶ 19], where it is used to define "Pro Rata

11

Share." "Pro Rata Share" does not appear anywhere in the plan after the definition section. Although maybe this can be disregarded as superfluous language, the United States objects now to avoid the risk that H.C. Jeffries one day takes the position that its claim is not "allowed" because the United States did not obtain an order allowing it.

Second, the H.C. Jeffries plan only allows the IRS to pursue non-bankruptcy remedies if Ford Steel "substantially defaults," but it does not say what "substantially" means. [Doc. No. 114, pp. 7 & 11]. Like the Ford Steel plan, the failure of H.C. Jeffries to define "substantially" risks H.C. Jeffries defaulting, forcing the IRS to pursue non-bankruptcy remedies, then dragging the IRS back into litigation over the meaning of this provision.

Fourth, the H.C. Jeffries plan only allows the IRS to pursue "administrative collection" remedies in the event of "substantial default." [Doc. No. 116, pp. 8 & 11]. Although this appears intended to permit the IRS to pursue all remedies under Title 26, it is not clear. The United States is concerned that H.C. Jeffries may later argue that this language prevents the IRS from recording a lien or filing suit in United States District Court.

Fifth, the United States objects to the "effect of confirmation" section of the H.C. Jeffries plan. [Doc. No. 114, p. 16]. It purports to permanently enjoin creditors from "collecting any indebtedness . . . outside of the confirmed Plan . . . ," without regard to whether (a) the indebtedness was not discharged pursuant to 11 U.S.C. § 1141(d)(6), or (b) H.C. Jeffries defaults under the plan. The H.C. Jeffries plan—if confirmed—should be limited to granting H.C. Jeffries a discharge under the Bankruptcy Code.

Sixth, the H.C. Jeffries plan says that the automatic stay will remain in effect "until consummation," but it does not define "consummation." [Doc. No. 114, p. 19]. This is another ambiguity that risks unnecessary future litigation, and the United States objects to it.

Accordingly, the United States requests that the Court deny confirmation of the plans proposed by Ford Steel and H.C. Jeffries Tower Company and grant the United States such other and further relief as is equitable and just.

Dated: October 2, 2018.

            Respectfully submitted,

            RYAN K. PATRICK,
            United States Attorney

      By: *s/ Richard A. Kincheloe*
            Richard A. Kincheloe
            Assistant United States Attorney
            Attorney-in-Charge
            United States Attorney's Office
            Southern District of Texas
            Texas Bar No. 24068107
            S.D. Tex. ID No. 1132346
            1000 Louisiana St., Suite 2300
            Houston, Texas 77002
            Telephone: (713) 567-9422
            Facsimile: (713) 718-3033
            Email: Richard.Kincheloe@usdoj.gov
            **Attorney for the United States of America**

## Certificate of Service

The undersigned certifies that he served the foregoing Objection on the parties receiving ECF notice in this case on October 2, 2018, through the Court's ECF notification system.

            *s/ Richard A. Kincheloe*
            Richard A. Kincheloe
            Assistant United States Attorney